No. 82,679

STATE OF KANSAS, *Appellee*, v. SAKONE MEL DONESAY, *Appellant*.

(19 P.3d 779)

Opinion filed March 9, 2001.

*Steven R. Zinn,* deputy appellate defender, argued the cause, and *Jessica R. Kunen,* chief appellate defender, was with him on the brief for appellant.

*Debra S. Peterson,* assistant district attorney, argued the cause, and *Charles R. Reimer* and *David Lowden,* assistant district attorneys, *Nola Foulston,* district attorney, and *Carla J. Stovall,* attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Sakone Mel Donesay appeals his jury convictions of premeditated murder, aggravated robbery, two counts of felony theft, felony criminal damage to property, and criminal possession of a firearm. Donesay was sentenced to a hard 40 term of imprisonment on the murder conviction and, on the other convictions, 119 months to run consecutive to the 40-year term.

This is the second time this case has been before the court. In *State v. Donesay,* 265 Kan. 60, 959 P.2d 862 (1998) (*Donesay I*), we reversed Donesay's convictions and remanded for a new trial because of prejudicial testimony by the widow of the murdered victim.

The following facts were the basis for the charges against Donesay. During the first week of January 1996, Donesay and several companions went to Dodge City in a stolen car and stole another one there. Driving the Honda Accord stolen in Dodge City, Donesay went to his parents' house, took his father's gun and a box of bullets, and went back to Wichita.

After Donesay damaged the front end of the Honda stolen in Dodge City, he abandoned it in rural Sedgwick County. Before leaving the car, Donesay shot it with his father's gun.

The defendant and Vuth Chhang then stole another Honda in Wichita. When they noticed that there was damage to the headlights, they decided they needed to get another car to avoid being stopped by police. With three female friends along in the stolen Honda, Donesay and Chhang drove around looking for another car.

Before locating another car to steal, they saw a sheriff's patrol car traveling in the opposite direction. The officer in the patrol made a U-turn and turned on his overhead lights. In trying to get away from the officer, Donesay missed a turn, lost control, and went through a fence and into a residential yard.

Donesay did not testify at the retrial, but his testimony from the first trial was read to the jury. With the exception of Officer Bowker's testimony about the cadence of the gunshots, the following paragraph quoted from *Donesay I* is based entirely on Donesay's testimony during the first trial:

"When the car had come to a stop, Donesay reached under the seat to get the gun, jumped out of the car, and ran. Donesay later told police that he did not think Officer Easter saw that he had a gun and that Easter did not shoot at him or tell him to drop his gun. The officer chased Donesay and several times told him to stop. As Donesay was trying to vault over a fence, Easter grabbed his leg. Easter pulled Donesay off the fence and they both went down. Within a very short time, Easter put his fingers in Donesay's mouth. With Donesay on his right side and Easter on top of him, Donesay put the gun over his shoulder and fired. Officer Bowker, who had arrived by then, heard two quick shots, a pause, and two more quick shots. Donesay testified that Easter "just faded away from me a little bit and I had to push him off a little bit." The defendant got up, saw Easter's gun, and grabbed it. As Donesay was getting up, he saw someone with a flashlight come around the corner and heard a gunshot. When Donesay tried to run, he fell. After a police officer caught and handcuffed him, they found that Donesay

had a gunshot wound in his leg, which he had accidentally inflicted himself." 265 Kan. at 62-63.

Officer Easter was shot at close range in the right forearm, the right shoulder, and the back of his head and neck. The bullet that entered the back of his neck traveled along his spinal column and through his right lung and liver, causing his death. Other injuries on his body included two small tears inside his lips, scrapes on his face, and a bite mark on his left leg.

Donesay first contends that the trial court abused its discretion in permitting the prosecution to stage an in-court demonstration of the positions of Donesay, the victim, and the gun.

During the testimony of Dr. Nashelsky, who performed the autopsy of Officer Easter, the State used two models to stage an in-court demonstration of the positions of Donesay and Officer Easter during their struggle. At Donesay's first trial, the State staged a similar demonstration. Because the court reversed Donesay's conviction due to the widow's testimony, we did not address his challenge to the demonstration in the first appeal. Before the second trial, defense counsel filed a motion in limine seeking to prevent the State from re-staging its demonstration. The trial court overruled the motion. Defense counsel's contemporaneous objection also was overruled.

In *State v. Dixon*, 248 Kan. 776, Syl. ¶ 9, 811 P.2d 1153 (1991), the court stated:

"The allowance of demonstrations or tests, to be performed in the presence of the jury, rests in the sound discretion of the trial court, and exercise of that discretion will not be overturned on appeal unless an abuse of discretion is apparent. A demonstration's propriety, probative value, and assistance to the trier of fact are determinations properly left to the trial court."

On this appeal, Donesay contends that the trial court abused its discretion in permitting the State to stage the demonstration on account of discrepancies between the actual and the simulated events.

Donesay contends that the heights and weights of the models who simulated the positions of him and Officer Easter did not match those of the people they portrayed. Donesay contends that

he and Officer Easter were "roughly the same size," but that the model who portrayed Officer Easter was smaller than the other model. According to Donesay, this gave the jury an inaccurate idea of the struggle between the two men. The models posed in static positions; the actual altercation was dynamic. Donesay contends that freezing the action distorted the jury's perception of the time in which he had to premeditate the shooting of Officer Easter. He urges the court to recognize the highly persuasive nature of such a demonstration and to reverse for lack of substantial similarity to actual people and events.

Examination of the transcript shows that the demonstration consisted of the two models being placed into positions, according to the statement given by Donesay. That demonstration was the basis for the pathologist's testimony as to his opinion of the placement of Donesay's gun as each of the four shots that wounded Officer Easter were fired. The purpose of the demonstration was to show the relative positions of the two men at the time each shot was fired; it was not to recreate the flow of movement. In other words, the demonstration was comparable to hypothetical snapshots rather than a movie.

The jury was well aware that the purpose of the demonstration was to illustrate Dr. Nashelsky's opinion. Nashelsky was asked if he would state an opinion to a reasonable degree of medical certainty of the relative positions of the men and the position of the gun based on his autopsy observations of entry and exit wounds and the paths traced by bullets. He responded that the use of models placed in the positions would be very helpful. Nashelsky was asked whether any differences between the heights and weights of the models and those of Donesay and Officer Easter would affect the accuracy of his positioning the gun, and he said that they would not.

Given the clear purpose of the demonstration and the circumstances in which it took place, there would seem to be little if any possibility that the jury would be confused or misled by any discrepancies between the sizes of the models and the actual participants. For the same reasons, there would be little if any possibility that the jury's perception of the duration of the struggle would be

distorted by the demonstration of frozen positions so as to affect its decision on premeditation. Moreover, the jury's decision about premeditation took into account more than how much time Donesay and Officer Easter were in physical contact. The jury could properly consider that Donesay consciously retrieved the gun from under the seat before he jumped from the car and ran, and the jury could consider the cadence of the gunshots.

There is no abuse of discretion.

We next consider whether the evidence was sufficient to permit a rational factfinder to find beyond a reasonable doubt that Donesay killed Easter intentionally and with premeditation.

The standard of review is well known:

"If the sufficiency of evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Claiborne,* 262 Kan. 416, Syl. ¶ 5, 940 P.2d 27 (1997).

In his brief, Donesay reviews the evidence tending to show that he killed Officer Easter intentionally and with premeditation—his taking the gun from the car, the cadence of the gunshots, and the positions from which he fired the gun. With regard to each aspect of the evidence, he suggests a nonincriminating interpretation or some reason for doubting its veracity or weight. His approach ignores the fact that this court must view the evidence in the light most favorable to the State.

The evidence, properly viewed by this court, is as follows: Donesay reached under the seat to get the gun before he jumped out of the car and ran. With Officer Easter on top of him, Donesay positioned the gun over his shoulder and fired. He fired two quick shots, paused, and fired two more quick shots. After the shots were fired, Easter's grip on Donesay slackened so that the defendant could free himself and run away.

We conclude that a rational factfinder could have found the defendant guilty beyond a reasonable doubt.

Donesay next contends that the trial court's definition of "premeditation" was erroneous. During the instruction conference, defense counsel requested the trial court to instruct the jury that

premeditation means to scheme, plan, and think the matter over beforehand. The request was refused. Defense counsel objected to an instruction defining premeditation as "to have thought over the matter beforehand." The jury was instructed, in a sentence at the end of the elements instruction for premeditated murder, that "[p]remeditation means to have thought over the matter beforehand."

During deliberations, the jury sent a note to the trial court that stated: "We would like a more detailed definition of premeditated murder." The prosecutor expressed his preference for "let[ting] the instructions stand as they are, rather than to become involved in a discussion with the jury on this point." Defense counsel concurred: "I tend to agree with [the prosecutor], that we're satisfied with the instruction that went in." Hence, the trial judge's response to the jury was simply: "Please read Instruction Number 7," which is the elements instruction for premeditated murder.

In the recent case of *State v. Saleem*, 267 Kan. 100, Syl. ¶ 2, 977 P.2d 921 (1999), the majority stated: "Premeditation as an element of first-degree murder means to have thought over the matter beforehand." Donesay urges the court to reconsider the matter. We decline to do so.

Donesay next argues that he was deprived of due process and is entitled to a new trial because he had to use one of his peremptory challenges to remove a person from the venire panel who should have been removed for cause. K.S.A. 2000 Supp. 22-3412(a)(2)(A) allowed 12 peremptory challenges to the defendant in this case. During voir dire, one of the prospective jurors expressed serious doubt about her ability to be fair and impartial due to her acquaintance with the Easter family. Asked directly if she could be fair and impartial if chosen as a juror, the prospective juror said that she could try, but she did not think she would be able to do it. Immediately after the prospective juror's answer, defense counsel addressed the court, "Your Honor." With no further prompting, the trial judge responded, "No. You may use your first peremptory challenge if you'd like, however." Defense counsel exhausted the challenges statutorily allotted to defendant, including one to remove this objectionable potential juror from the panel. Donesay

argues that as a consequence of the trial court's refusing to remove the prospective juror for cause, he was denied his full allotment of peremptory strikes, which amounted to a denial of due process. He does not argue that he was forced by lack of peremptory challenges to permit any jurors which he believed were biased to sit on the jury that convicted him.

This issue was resolved by the United States Supreme Court in a decision filed after Donesay's brief was filed. The facts before the Supreme Court in *United States v. Martinez-Salazar*, 528 U.S. 304, 145 L. Ed. 2d 792, 120 S. Ct. 774 (2000), although in federal court, were otherwise indistinguishable from those in the present case. A prospective juror stated that he would favor the prosecution. Defense counsel challenged the prospective juror for cause, and the district court declined to excuse him. Defendant used all his peremptory challenges, including one to remove the prospective juror. The Court of Appeals reversed Martinez-Salazar's convictions on the ground that "the District Court's error in denying the for-cause challenge forced Martinez-Salazar to use a peremptory challenge curatively, thereby impairing his right to the full complement of peremptory challenges to which federal law entitled him." 528 U.S. at 309-10. The Court of Appeals concluded that the District Court's error "resulted in a violation of Martinez-Salazar's Fifth Amendment due process rights." 528 U.S. at 309. The Supreme Court reversed. It held "that if the defendant elects to cure such an error by exercising a peremptory challenge, and is subsequently convicted by a jury on which no biased juror sat, he has not been deprived of any . . . constitutional right." 528 U.S. at 307. As conceded by appellant's counsel at oral argument, this decision is controlling in the present case. Thus, Donesay was not denied his due process rights under the Fourteenth Amendment to the United States Constitution.

Donesay next argues that the hard 40 sentencing scheme is unconstitutional because it does not provide for jury determination beyond a reasonable doubt of all facts that may increase the penalty. Since his brief was filed, this court has had the opportunity to consider precisely the same constitutional arguments Donesay makes. In *State v. Conley*, 270 Kan. 18, 11 P3d 1147 (2000), this

court held that the hard 40 sentencing scheme violated neither the Sixth and Fourteenth Amendments of the federal Constitution nor Section 5 of the Kansas Bill of Rights. Our holding in *Conley* is controlling in the present case.

Judgment in the district court is affirmed.