No. 85,256

STATE OF KANSAS, *Appellee*, v. BRYAN L. BROYLES, *Appellant*.
(36 P.3d 259)

Opinion filed
December 14, 2001.

*Daniel E. Monnat*, of Monnat & Spurrier, Chartered, of Wichita, argued the cause and was on the brief for appellant.

*Melissa G. Johnson*, assistant attorney general, argued the cause, and *Carla J. Stovall*, attorney general, was with her on the brief for appellee.

The opinion of the court was delivered by

LARSON, J.: This is Bryan L. Broyles' direct appeal of his jury conviction of first-degree felony murder, K.S.A. 21-3401(b), with the underlying felony being abuse of a child, K.S.A. 21-3609, for the death of his 6-month-old son. He was sentenced to life imprisonment with consideration of parole after 15 years (hard 15). Our jurisdiction is pursuant to K.S.A. 22-3601(b)(1).

Broyles contends his conviction should be reversed based on (1) insufficiency of evidence, (2) prosecutorial misconduct, (3) admission of hearsay reports and conclusions of nontestifying medical experts, (4) exclusion of relevant evidence supporting his theory of defense, (5) admission of speculative and confusing rebuttal evi-

dence, (6) refusal to strike a biased venireperson for cause, later removed by a peremptory strike, and (7) cumulative error.

*Factual and procedural background*

While the medical evidence was disputed, and Broyles vigorously contended none of his actions resulted in his son's death, the remaining facts were not largely in dispute.

On the morning of September 1, 1998, 6-month-old Hagen Broyles appeared to be in his usual healthy state. The only previously noticed injuries were two small bruises on his neck and one on his chest, spotted by his mother, Mandi Brown, after he was picked up from Country Kids Day Care Center several days previously. His mother brought him to Country Kids Day Care Center, which he had been attending for the last week. A day care center worker named Megan Larcum was working there at the time. At 3:45 p.m., Hagen was picked up by his babysitters, Karen Stack and Tonya Rogers. Neither noticed anything unusual about Hagen's behavior. The girls took Hagen to Alco, where his mother worked, in order to buy diapers. Brown visited with Hagen for a short time while she was working and stated he appeared fine and was laughing. While at Stack's house, Hagen ate and played. Around 6 p.m., he was picked up by Broyles. He took Hagen to his mother's home for approximately 45 minutes, then went home to the trailer he and Brown had recently purchased. Only he and Hagen were present at the trailer.

Broyles stated that Hagen appeared fine when he first picked him up but later on became fussy, and that he would fall asleep, then wake up crying. Bryan testified that at approximately 8 p.m., he was changing Hagen's diaper and noticed Hagen was gasping for air and then stopped breathing. He picked Hagen up and Hagen's eyes rolled back and his body went limp. He called 911 for help and arranged to meet an officer at a major intersection close to his trailer. When the deputy sheriff arrived at the scene, he noticed Broyles sitting with a baby in the truck, and the child's face appeared blue. After a failed attempt at conversing with Broyles, he took the child from Broyles' arms and administered rescue breathing until an ambulance arrived.

Hagen was initially taken to Greenwood County Hospital, where he was examined by Dr. Michael McClintick. Dr. McClintick did not notice any large areas of bruising on Hagen; however, Hagen was unresponsive and anemic (low red blood cell count due to blood loss). Hagen was flown to Wesley Medical Center in Wichita, Kansas.

While at Wesley, concerns arose about the nature of Hagen's injuries. A pediatrician from the Child Protection Team, Dr. Katherine Melhorn, was consulted. She interviewed Mandi, spoke to the hospital staff involved, and also examined Hagen. She noted petechial bruising (superficial breaks of blood vessels which cause little red spots) on Hagen's right forehead and around his right eye. She also noticed a circular brown bruise below the jaw and an irregular purplish bruise on the right ankle. Upon examination of Hagen's eyes with an ophthalmoscope, she noticed hemorrhaging in both retinas. The same retinal hemorrhages were also seen by Dr. Curtis Pickert, another attending physician at Wesley. Dr. Pickert also noted the soft spot on Hagen's skull was ridged, evidencing swelling of the brain.

Several other tests were performed and it was discovered that Hagen did have cerebral edema, or swelling of the brain. A large subdural (under the dura mater of the skull, but on top of the brain) hematoma was discovered on the front right side of Hagen's head. The hematoma appeared to be acute (new blood), estimated at less than 10 days old. The report also stated there was potential evidence of a chronic (old) hematoma. Hagen never regained consciousness from the time he was admitted into the hospital. Tests showed his brain was no longer viable; he was removed from life support and pronounced dead on September 3, 1998.

A subsequent autopsy by Dr. Corrie May revealed Hagen had three fractured but healing ribs, which had been broken at least 7 to 10 days prior. She also found a skull fracture approximately 2 inches in length at the back of Hagen's skull. When the skull was opened, she spotted and photographed multiple sites of subarachnoidal hemorrhages (bleeding between the brain and the thin cellophane-like layer covering the brain called the arachnoid membrane). She also spotted evidence of a very minute amount of

old bleeding, appearing as a yellowish streak, which she stated could have in no way been attributable to the new subdural and subarachnoidal hemorrhages.

Hagen's brain was also examined by Dr. Michael Handler. He noted that there was a substantial amount of dead neurons (dead brain tissue). He also spotted an old subdural hemorrhage, but noted that it was well past the healing stage, possibly even months old, and could have in no way be attributable to the new bleeding. Dr. Handler did a test for retraction bulbs on the axons which would have been indicative of diffuse axonal injury, generally related to shaking of infants. (The retraction bulbs form as part of a healing attempt by the brain, in an attempt to reconnect neurons that have been torn apart.) The test results were negative, but he explained that was probably due to the quick onset of lack of oxygen to the brain or that so many neurons were torn that brain death was immediate. He stated that the bulbs take 18 to 72 hours to form, and once the tissues die the reparative process stops.

At Broyles' trial, Dr. Melhorn opined that Hagen died of abusive head trauma. Dr. May concluded that the cause of death was shaken impact syndrome. Dr. Handler testified the brain injuries were not consistent with a fall, but rather with shaken baby syndrome, where the child was shaken, then thrown. Dr. Pickert stated that Hagen's condition did not fit his reported history and that child abuse may have been the cause of his injuries. Dr. May opined that the injuries to Hagen's ribs, due to their posterior location and the age of the infant, indicated inflicted, not accidental, trauma. Drs. Handler, May, and Melhorn each agreed that there was no possibility Hagen could have appeared normal after he received the head injury.

In his defense, Broyles called Dr. Michael Arnall, who had reviewed the reports and records surrounding Hagen and his medical treatment. Dr. Arnall concluded the subdural hematoma resulted from spontaneous rebleeding, resultant of no trauma or a trivial amount of trauma. He based this conclusion on lack of a finding of any evidence of new trauma, in that there were no retraction bulbs discovered and no evidence of new rib fractures. He found the skull injury to be "quizzical" and opined that the skull fracture

might be an old fracture that was pulled apart (rebroken) by the swelling of the brain. Considering the possibility that Hagen did in fact die from being shaken, Dr. Arnall stated the onset of symptoms from a blunt force trauma or shaking could be over several days, weeks, or even years. He noted that symptoms might include cursory fits, change of eating habits or lack of appetite, fussy behavior, or too much or too little sleep, but he added that some children may not display any symptoms.

The jury found Bryan Broyles guilty of felony murder. His motion for a new trial was denied. He was sentenced as earlier stated and now appeals.

*Insufficient evidence*

When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Jasper*, 269 Kan. 649, 655, 8 P.3d 708 (2000).

Broyles' challenge is directed to conflicting medical expert testimony. While he does admit that several medical conditions of Hagen were proven at trial, he notes that although Dr. Arnall's opinion was based on the same general facts, he reached a different opinion than the State's medical experts. He contends this conflict shows insufficiency of the evidence. When reviewing sufficiency of the evidence in a case such as this, we said in *State v. Saiz*, 269 Kan. 657, 664, 7 P.3d 1214 (2000), that "[i]t is not the function of an appellate court to reweigh the evidence or pass on the credibility of witnesses. [Citation omitted.] A conviction of even the greatest offense may be sustained by circumstantial evidence. [Citation omitted.]" This has been our longstanding rule.

The State's medical experts noted Hagen had three broken but healing ribs, a fracture in the back of his skull, hemorrhaging around the fracture, and retinal hemorrhaging in both eyes. They concluded Hagen died of shaken impact syndrome, specifically including a blunt trauma to the head, and that the onset of symptoms would have been immediate after the act of abuse occurred.

While the opinions of the defense expert raised the possibility that Hagen may have appeared lucid for some time after the injuries, creating a question as to whether the injuries occurred while he was within Broyles' sole control, there was evidence that the rib fractures were indicative of past abusive treatment. The State's experts testified that the onset of symptoms of the brain injuries would have been immediate, caused by severe brain swelling and bleeding. The jury had the right to reject Dr. Arnall's conclusions, as the verdict shows it did.

We do not find *State v. Matlock*, 233 Kan. 1, 660 P.2d 945 (1983), or *State v. Naramore*, 25 Kan. App. 2d 302, 965 P.2d 211, *rev. denied* 266 Kan. 1114 (1998), to be controlling. Both cases are completely different factually and do not compel a result different from that the jury reached.

Examining the evidence in the manner in which we are required to do clearly shows that there was sufficient evidence to support the conviction.

*Prosecutorial misconduct*

Broyles next contends that comments made by the prosecutor during closing argument were misconduct and prejudiced his right to a fair trial. Our standard of review for prosecutorial misconduct was stated in *State v. Pabst*, 268 Kan. 501, 504-05, 996 P.2d 321 (2000), as follows:

"Reversible error predicated on prosecutorial misconduct must be of such a magnitude as to deny a defendant's constitutional right to a fair trial. See *State v. Sperry*, 267 Kan. 287, 308, 978 P.2d 933 (1999). Some complained-of prosecutorial statements were not objected to at trial. If the claimed error has been determined to implicate a defendant's right to a fair trial, our standard of review is the same whether or not an objection was made at trial. If the claimed error rises to the level of a denial of the Fourteenth Amendment right to due process, the issue will be addressed. *State. v. McCorkendale*, 267 Kan. 263, Syl. ¶ 6, 979 P.2d 1239 (1999)."

This standard was summarized in *State v. Deiterman*, 271 Kan. 975, 987, 29 P.3d 411 (2001) (quoting *State v. Campbell*, 268 Kan. 529, 539, 997 P.2d 726 [2000]), in this manner:

" ' "The analysis of the effect of a prosecutor's alleged improper remarks in closing argument is a two-step process. First, we decide whether the remarks

were outside the considerable latitude the prosecutor is allowed in discussing the evidence. In criminal trials, the prosecution is given wide latitude in language and in manner or presentation of closing argument as long as the argument is consistent with the evidence. Second, we must decide whether the remarks constitute plain error; that is, whether they are so gross and flagrant as to prejudice the jury against the accused and deny a fair trial, requiring reversal." [Citation omitted.]' "

Broyles cites to three separate instances of misconduct during closing and then makes a cumulative argument that while the three separate incidents by themselves may not have denied him a fair trial, taken together they did.

*Shifting the burden of proof*

Broyles first argues the prosecutor improperly shifted the burden of proof when she commented on his failure to call several family members who had extensive knowledge of Broyles' relationship with Hagen.

During closing arguments, the prosecutor stated:

"But more importantly who did we not hear from? We didn't hear from the people that he actually lived with during that time, did we? We heard from Mandi Brown. But we didn't hear from the Robinsons. We didn't hear from Mandi's sister, who Bryan indicated they had lived with for the six months of his life."

At this point, defense counsel objected and the following colloquy occurred:

"[DEFENSE COUNSEL]: When I was presenting this evidence, the State objected and the Court indicated it would cut me off. These witnesses were present in the courthouse. The State can't now come in and say he didn't call them to testify. We would have called them to testify. The State is the one that kept us from being able to present that evidence.

"THE COURT: Were you going to call these people?

"[DEFENSE COUNSEL]: Very likely.

"THE COURT: Very well.

"[DEFENSE COUNSEL]: Judge, you informed me—we had this discussion and the Court indicated to me that you were going to cut me off after a witness. I told the judge I did have other witnesses here.

"THE COURT: Okay. Well, let's move on then to another subject. I agree."

An examination of the entire record clearly shows that defense counsel's argument during closing and on appeal is not supported by the facts.

The trial court allowed the defense to present testimony from 10 separate witnesses who related their observations of the interaction between Broyles and Hagen. One witness' testimony was presented through a deposition transcript and the defense also introduced a video clip of Broyles' and Hagen's interaction.

During testimony of the seventh witness, Russell Hewitt, the prosecutor objected, complaining that Hewitt had only seen Bryan and Hagen Broyles together on one instance. When asked the grounds for her objection, she stated, "Specific instance of conduct." The prosecutor further clarified her contention: "Definitely that . . . would not go to relationship, just a one—one time instance." When asked by the court, "How many more of these do you have like this?" defense counsel responded, "[J]ust be one or two more."

The court initially ruled that it would allow counsel to call its remaining witnesses, even if the witnesses' exposure to Broyles' relationship with Hagen was slight. However, upon further arguments by defense counsel, the court altered its ruling: "[W]ell, I will let this one go, but I don't think I want another just one time shot. . . . I think they need be a longer span there."

The trial court allowed the defense to finish Hewitt's testimony and allowed two more witnesses to testify about Broyles' relationship with Hagen. During the testimony of Cathy Stapleford, an issue arose concerning introduction of a video clip of Broyles interacting with his son. The discussion related to whether Broyles was in fact introducing his character into evidence through evidence of specific conduct. The court made comments relating to K.S.A. 60-446 and K.S.A. 60-447, with the defense continuing to assert that the evidence being offered was not character evidence but only evidence regarding the nature of their relationship. The State also argued that the evidence had become repetitive, and defendant contended this was not so because each witness had testified to different instances. After the court held it would allow the video clip to be received in evidence, defense counsel stated, without any prompting from the court: "I would inform the Court this will be the last witness in this type of evidence in this series of witnesses. We will move on to a different area."

Broyles' claim that he was prevented by order of the court or objection of opposing counsel from calling relatives on his behalf who would have had extensive knowledge of his relationship with Hagen is unfounded. The record shows that he was allowed to call all the witnesses which he wished to present. The difference between placing his character in issue and establishing a relationship with the victim did become somewhat blurred in this case, but the trial court was generous in allowing testimony that could well have been deemed repetitive, and clearly allowed Broyles to present every desired witness on the relationship issue.

We have held that it is not reversible error for either party to comment during closing argument on the failure of the other party to produce witness testimony that would presumably bolster that party's theory, so long as the witnesses were available to the party and the argument would not infringe on the defendant's right to remain silent. See *State v. Verge,* 272 Kan. 501, 34 P.3d 449 (2001); *State v. Baker,* 249 Kan. 431, 446, 819 P.2d 1173 (1991); and *State v. Wilkins,* 215 Kan. 145, 150-51, 523 P.2d 728 (1974). We have held it was not erroneous for a prosecutor to rhetorically ask the jury why a witness would not have been called whose testimony would have been exculpatory. Broyles theorized in his case and during closing argument that he had an excellent relationship with Hagen, and the prosecutor's comment on his failure to call relatives who had more intimate knowledge of and exposure to that relationship is not prosecutorial misconduct.

### Vouching for the credibility of the expert witnesses

In discussing the expert witnesses, the prosecutor stated:

"You have to decide if those four witnesses [the State's experts] are more credible than Dr. Arnall [the defense expert]. . . . What motives do the [State's doctors] have to come in and say anything other than that they believe what the cause was? They have no motive to come in and tell you something that's untruthful. Let's look at Dr. Arnall. [He never saw Hagen or conferred with the other experts about the case.]

"His testimony is based only on what he found in their records and reports. . . . Now, what possible reason would he have [for] coming? Well, you heard him say he is being paid a thousand dollars a day to come and testify in this case."

Broyles notes that there was nothing in evidence as to what the State's experts were paid, and he claims that this comment regarding the charge for his witness was improper and that credibility may not be raised in this manner.

This is not a question that was objected to during closing argument and so the prosecutorial misconduct issue falls under the contemporaneous objection rule. *State v. Campbell*, 268 Kan. 529, 541, 997 P.2d 726, *cert. denied* 531 U.S. 832 (2000). However, this is a part of Broyles' overall claim of lack of a fair trial. While we do not endorse attempts to link expert opinions to their cost, we would not preclude such an assertion where found to be material. There was full right of cross-examination as to compensation received or the interest in the case, and we do not hold the unobjected-to comment to be prosecutorial misconduct.

### Reference to defendant as a "consistent liar"

Broyles argues that the prosecutor committed prejudicial misconduct by commenting during closing argument that he was a "consistent liar." The State admits that it did make an improper comment, but contends that the error should not require reversal. During Broyles' closing argument, his counsel stated the following:

"The third thing that's troubling to me is that Bryan's account of what happened has never varied. It's always been consistent. It's just easier to tell the truth than to lie then you got to remember what the lie is. But Bryan's account has always been consistent. . . .

"So what did happen on the evening of September first of 1998? You heard the testimony, you saw and heard Byran Broyles testify. Did it appear that Bryan was acting? Is Bryan Broyles just a good liar? Your watched when he testified, what happened? You saw his demeanor, you observed his mannerisms. Did it appear to you he was lying or that he was being truthful?"

Apparently in response to this line of argument, the prosecutor replied in rebuttal:

"The defendant has told the same story throughout the whole time. Well, again I have to disagree with that. You heard the statements that he made, things that he said, and you heard what he said on the stand today. They talk about where—where the things were in the room right where Bryan said they were. When he testified today he knew where he sat. He watched that video tape. I want you to think of all the statements you heard about what defendant said. And even something within your more common sense, *he is a consistent liar*. What does he have

to make up here? He doesn't have to make anything up. He just left one little small thing out. How difficult is it to say the thing over and over again if you are just leaving out one small 30 second portion of what happened." (Emphasis added.)

Again, there was no objection, and this must be considered in light of whether Broyles' due process rights were so violated that a new trial must be granted. See *State v. Lumley*, 266 Kan. 939, 965, 976 P.2d 486 (1999).

Broyles relies solely on *State v. Pabst*, 268 Kan. 501, 996 P.2d 321 (2000). *Pabst* was a case where there were numerous continued and pointed references to the defendant as a liar, which found in that case to be prejudicial error. However, in this case the record shows only the single statement which appears to be in direct response to the defense's comment. Broyles' suggestion that ill will should be inferred is not supported in the record. In *State v. Lockhart*, 24 Kan. App. 2d 488, 490, 947 P.2d 461 (1997), ill will was found but the prosecutor there disregarded a prior sustained objection and continued to refer to defendant and counsel as liars. Such facts are not before this court.

The context in which the prosecutor's statement was made must be considered. The statement was made not during an attack upon Broyles' credibility, but rather in tying together strong expert testimony as opposed to Broyles' statements at trial. It appears to be the prosecutor's misguided attempt to find an alternative theory to the defense's argument that consistency equates with truth. The statement was clearly improper, but does not rise to the level of being gross or flagrant, nor did it compromise Broyles' right to a fair trial.

We have considered all the arguments as they relate to the prosecutor's entire closing argument and find the cumulative effect was not sufficient to reverse and require a new trial.

*Admission of hearsay reports and conclusions of nontestifying medical experts*

Broyles argues that the State's medical experts were improperly allowed to rely upon tests and conclusions of other nontestifying experts. He argues this is error equated to improper admission of

hearsay evidence and was a violation of his Sixth Amendment right to confrontation. Specifically, he complains of testimony concerning the results of clotting studies, x-rays, a bone scan, and a CT scan, with accompanying diagnostic reports and the report of Dr. M. Rupani.

We have held: " 'The admissibility of expert testimony lies within the sound discretion of the trial court and its determination will not be reversed on appeal absent a showing of abuse of discretion.' *State v. Stuckey*, 242 Kan. 204, Syl. ¶ 1, 747 P.2d 137 (1987)." *State v. Humphrey*, 252 Kan. 6, 14, 845 P.2d 592 (1992).

Also involved in these contentions are K.S.A. 60-456(b) and (c):

"(b) If the witness is testifying as an expert, testimony of the witness in the form of opinions or inferences is limited to such opinions as the judge finds are (1) based on facts or data perceived by or personally known or made known to the witness at the hearing and (2) within the scope of the special knowledge, skill, experience or training possessed by the witness.

"(c) Unless the judge excludes the testimony he or she shall be deemed to have made the finding requisite to its admission."

and the provision of K.S.A. 60-460, which states:

"Evidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated, is hearsay evidence, and inadmissible except:

. . . .

"(m) Business entries and the like. Writings offered as memoranda or records of acts, conditions or events to prove the facts stated therein, if the judge finds that (1) they were made in the regular course of a business at or about the time of the act, condition or event recorded and (2) the sources of information from which made and the method and circumstances of their preparation were such as to indicate their trustworthiness."

### (1) Clotting studies

The clotting studies, including a platelet count, a prothrombrin time (PT) test, and a partial prothrombrin time (PTT) test, are referred to twice in the record, both as part of Dr. Katherine Melhorn's testimony. Dr. Melhorn's report on the death of Hagen Broyles concluded that he died of abusive head trauma immediately prior to the onset of symptoms. In the report she cites to blood clotting tests and various results and states that they were normal. However, at trial, apparently misquoting this report, she

testified that the clotting tests were abnormal. Neither the State nor defense attempted to correct this inconsistency. She stated at trial the purpose of the tests was to see if there might be an alternative cause of the bleeding in Hagen's head.

Defense counsel objected to the reference to the results of the clotting tests stating: "I'm going to object at this time, unless whoever did the lab test procedure is going to be called to testify." When informed that the tests were performed at the Wesley Medical Center where Dr. Melhorn practiced, the trial court admitted the report under the business records exception of K.S.A. 60-460(m).

We said in *In re Estate of Bernatzki*, 204 Kan. 131, 134-36, 460 P.2d 527 (1969), that hospital medical records are admissible in evidence as business records under the K.S.A. 60-460(m) exception. It is argued by the State that all of the evidence in question was in the form of medical records and was thus admissible.

The defendant argues that the medical report's admission was improper and to do so allows a party to bootleg into evidence a hearsay conclusion under the pretense that it is either a record or part of the basis of the party's conclusion. Somewhat supportive of the defendant's position is *State v. Carson*, 216 Kan. 711, 713, 533 P.2d 1342 (1975), where we held that a written report of a blood test result which placed the defendant at the scene of an attempted burglary was not admissible under a hearsay exception.

In this case there is nothing in the record establishing that the clotting studies were anything other than a machine test which could be performed by a nonexpert and were a part of the Wesley records. Broyles failed to object to the foundation of the record and only complained that it should not be admitted unless the precise individual who performed the tests was called. We hold the report was properly referred to and admitted under the facts of this case.

(2) X-Rays, Bone Scan, CT Scan, and Accompanying Diagnostic Reports, and Eye Examination

Although Broyles objected to these items coming into evidence or being referenced, all were properly brought into evidence by

means that avoided the rule against hearsay evidence. In effect, these facts were "made known" by direct observation of the experts at the trial, regardless of what their reports were based on prior to trial. See *State v. Marks*, 231 Kan. 645, 655, 647 P.2d 1292 (1982); *Klein v. Wells*, 194 Kan. 528, 539, 400 P.2d 1002 (1965).

The retinal hemorrhages were noted by Dr. Melhorn in her personal examination of Hagen's eyes. Dr. May personally observed the skull fracture during the autopsy and also found a large subdural hematoma as well as a small old hematoma. Dr. May also noted in her report the discovery of three old and healing rib fractures on the posterior aspect of the left ribs. All intracranial hematomas were thoroughly documented by Dr. Handler's neurological autopsy. These constitute all of the relevant information produced by the complained-of reports upon which the State's experts relied in reaching their respective conclusions. As these facts were in evidence, they were properly relied on by the State's experts under K.S.A. 60-456(b)(1) and (2).

(3) Report of Dr. M. Rupani

This was a separate report referenced in Dr. May's autopsy report. It was apparently made by an outside consultant Dr. Rupani, who was not a part of the hospital staff, and allegedly was improperly referred to. It does relate to the retinal hemorrhaging in Hagen's eyes, but Dr. Melhorn testified that she had observed this hemorrhaging herself at the time of her evaluation. This evidence appears to fall under the provisions of K.S.A. 60-456(b) and (c) and was necessary to aid the jury in making its determination. We find that admission of this evidence was not reversible error and had little if any effect upon the determination of the case.

The trial court did not abuse its discretion or violate the defendant's confrontational rights by admitting the objected-to reports and testimony.

*Exclusion of relevant evidence supporting defendant's theory of defense*

Broyles next argues the trial court abused its discretion by excluding the testimony of two mothers who would have testified their young children stated, while in an excited state, that they were

improperly treated at the day care center. He also contends the trial court erroneously excluded testimony about his exemplary relationship with his son.

The question of whether the trial court erred in admission of evidence is subject to an abuse of discretion standard of review. *State v. Mixon*, 27 Kan. App. 2d 49, 53, 998 P.2d 519, *rev. denied* 269 Kan. 938 (2000). Judicial discretion is abused only when no reasonable person would take the view adopted by the trial court. *State v. Lumley*, 266 Kan. 939, 950, 976 P.2d 486 (1999).

Broyles contends courts have long recognized the right of a criminal defendant to present his or her theory of defense. See *Chambers v. Mississippi*, 410 U.S. 284, 294, 35 L. Ed. 2d 297, 93 S. Ct. 1038 (1973); *State v. Bradley*, 223 Kan. 710, 714, 576 P.2d 647 (1978).

We first turn to his claim that the trial court erred in refusing to allow testimony of treatment at the day care center.

The morning prior to trial, the State's motion in limine was heard to determine the competency of two 4-year-old children and one 8-year-old child, as well as the relevancy of their respective testimonies. It was proffered the children had been earlier mistreated at the same day care center which cared for Hagen on the day he was hospitalized. The 8-year-old competently testified that a day care employee (who was on duty on September 1, 1998) shook and slapped the infants and treated other children in a physically violent manner.

Neither of the two 4-year-old boys were able to show sufficient competency to testify. One was unable to tell truth from lies and the other was agreeable with whatever was said. The court further noted that the events about which the boys were being asked had occurred when the boys were "a couple years younger" (actually, about 20 months earlier), and this fact would have made them between 2 and 3 years old at the time. The defense then requested that the mothers be permitted to testify on behalf of the 4-year-olds under either the excited utterance exception, K.S.A. 60-460(d)(2), or the unavailable witness exception, 60-460(d)(3).

The trial court denied the request, finding that the alleged statements were not trustworthy and that even under these exceptions

"the court has got to find that the declarant understands the truth—the difference between a truth and a lie and is capable of articulating some particular events."

The court found that the 8-year-old was competent, and as to her testimony ruled: "I'm just going to let the jury listen and decide for themselves." For some unknown reason the 8-year-old was not called as a witness by the defense during trial.

The two exceptions to the hearsay rule relied upon by Broyles are K.S.A. 60-460(d)(2) and (3), which are often referred to as the "excited utterance exception" and the "unavailable declarant exception." Those exceptions read:

"(d) *Contemporaneous statements and statements admissible on ground of necessity generally.* A statement which the judge finds was made . . . (2) while the declarant was under the stress of a nervous excitement caused by such perception, or (3) if the declarant is unavailable as a witness, by the declarant at a time when the matter had been recently perceived by the declarant and while the declarant's recollection was clear and was made in good faith prior to the commencement of the action and with no incentive to falsify or to distort."

The parties' arguments are predictable. Broyles cites *State v. Myatt*, 237 Kan. 17, 22-23, 697 P.2d 836 (1985), and *State v. Rodriguez-Garcia*, 27 Kan. App. 2d 439, Syl. ¶ 5, 8 P.3d 3 (1999), *rev. denied* 269 Kan. 939 (2000), where such testimony was allowed. The State relies on cases such as *State v. Rowe*, 252 Kan. 243, 248, 843 P.2d 214 (1992), where similar testimony was not allowed and which held that "[w]hether a statement measures up to the requirement of spontaneity is largely a matter for the discretion of the trial court." *Rowe*, 252 Kan. at 249. The State also argued (d)(3) is not a "firmly rooted hearsay exception" and so evidence admitted pursuant to it must be excluded absent a particularized guarantee of trustworthiness, and the trial court is necessarily given considerable discretion in admitting statements under these exceptions. See *State v. Hobson*, 234 Kan. 133, 158, 671 P.2d 1365 (1983).

A concise discussion of these hearsay exceptions is found in Barbara, Kansas Rules of Evidence with Evidence Objections and Evidentiary Foundations § 7.6 (3d ed. 1993):

"**Comment:** This exception to the hearsay rule dealt with declarations made before, during or after the happenings of the principal occurrence. Where the dec-

larations were so clearly connected with the principal occurrence they in reality formed a part of the occurrence. This section replaced the *res gestae* exception with the contemporaneous statement exception of admissibility to hearsay. Clause (1) requires that the statement be strictly contemporaneous with the act described, and clause (2) that it be made while the declarant was under the 'stress of nervous excitement' caused by the act. [Citations omitted.]

"*State v. Rowe,* 252 Kan. 243, 843 P.2d 714 (1992), details most extensively the application of K.S.A. 60-460(d)(1), (2) and (3). Citing Judge Gard the court explains the difference between (d)(1) and (d)((2) . . . . 'Clauses (1) and (2) of this section . . . . describe conventional *res gestae,* admissible hearsay with the characteristic of spontaneity arising either from the reaction to contemporary perception or from the excitement which carries over from the event. . . . Whether a statement measures up to the requirement of spontaneity is largely a matter for the discretion of the trial court. . . .' 1 Gard's Kansas C. Cir. Proc. 2d Annot. §60-460(d), p.239 (1979)."

"In *Rowe,* the court cited Barbara on Kansas Evidence Objections with Evidentiary Foundations, that the state failed to show that an 'event or condition occurred' as required to establish proper foundation of K.S.A. 60-460(d)(1), and under K.S.A. 60-460 (1)(2), the state failed to prove the declarant made the statement 'startlingly sufficient to cause nervous excitement' (pp. 249-50).

"Under clause (3) above, before any hearsay statements are admissible, the trial judge must find:

(1) the declarant is unavailable as a witness,

(2) the matter described was recently perceived by the declarant and made while memory was fresh, and

(3) the statement was made under circumstances so as to show that is was in good faith, before there was any action pending, and with no incentive to falsify or distort.

"The court is given considerable discretion in admitting statements under this exception. The presence or absence of an incentive to falsify or distort is a question of fact for the trial judge to determine in light of all the circumstances. *State v. Hobson,* 234 Kan. 133, 158, 671 P.2d 1365, 1386 (1983) (no error in court's refusal to admit statement not reliable). *State v. Garner,* 237 Kan. 227, 242, 699 P.2d 468, 479 (1985) ( no error in court's discretion in admitting testimony). *State v. Rodriguez,* 8 Kan. App. 2d 353, 657 P.2d 79 (1983) (child victim's statement); *State v. White,* 234 Kan. 340, 673 P.2d 1106 (1983), *State v. Rowe, supra.*

"Whether a statement falls within the spontaneity rule is a matter of judge's discretion. *State v. Lomax,* 175 Kan. 368, 264 P.2d 908 (1953). In *State v. Berry,* 223 Kan. 566, 575 P.2d 543 (1978), a hearsay statement of robbery victim, though not contemporaneous with the event described, was admitted where the statement concerned events recently perceived. Testimony of a driver whose car was passed by the defendant's truck immediately before collision with plaintiff's car that 'I just figured the way he was driving, he was looking for an accident' did not come within the hearsay rule as to mental condition. *McGlothlin v. Wiles,* 207 Kan. 718,

487 P.2d 533 (1971). But *see Hastings v. Ross*, 211 Kan. 732, 508 P.2d 514 (1973) where the declarant stated 'that boy is going to kill somebody one of these days' as she saw the speeding car."

See 4 Jones on Evidence § 28:1-26 (7th ed. 2000).

It is not helpful to attempt to analyze the existence or absence of the specific requirements of (d)(2) or (d)(3), as the trial court's refusal was centered on its finding of the complete unreliability of the stories of two children between ages 2 and 3, which were to be recounted some 20 months later when their ages were between 4 and 5 years old. The unreliability finding clearly justifies the denial of the mothers' testimony. This is proper under our holding in *State v. Hobson*, 234 Kan. at 159, where we affirmed a ruling based on the lack of reliability of the supposed declarant and lack of ability to cross-examine the declarant as well.

We do not find the trial court abused its discretion in refusing to allow the mothers' testimony.

It should be pointed out again that the 8-year-old girl appeared to be a very competent witness, and the trial court ruled that her testimony as to the events at the day care center in the summer prior to Hagen's death could be offered to the jury. Also, the day care worker who was the subject of the accusation, was not cross-examined on her treatment of the children, which would have been another way to bring this defense before the jury. The trial court did not err and did not prevent Broyles from raising and adequately presenting his theory of defense.

Broyles also argues he was prevented from showing that his relationship with Hagen was such that he could never have abused him. As we have previously stated in the discussion of the claimed error of prosecutorial misconduct, Broyles presented testimony of 10 different witnesses who each spoke of the relationship between Broyles and his son in positive terms.

There was opportunity for more detailed testimony to have been presented, although at some point it may have been proper for an objection to be sustained on the evidence as cumulative. The selection of the witnesses was Broyles' decision, and the trial court allowed him great leeway in presenting his defense. This contention does not show reversible error.

*Admission of speculative and confusing rebuttal evidence*

Broyles contends that the trial court erred in allowing the State to produce as a rebuttal witness one of the attending nurses at Greenwood County Hospital. He complains that her testimony was irrelevant and prejudicial.

As its sole rebuttal witness, the State called Anita Mills, a registered nurse who was present when Hagen was initially brought to the hospital by ambulance. Immediately after Hagen was taken in, she testified that she observed Broyles leaning against a brick wall. She heard him say that "he wished he could get out of there—maybe not the exact words—while he could get going."

Broyles' challenge of this statement reflects a misunderstanding of this court's standard of review of the admission by the trial court of rebuttal evidence. In *State v. Willis*, 240 Kan. 580, 583, 731 P.2d 287 (1987), we stated:

"Rebuttal evidence is that which contradicts evidence introduced by an opposing party. It may tend to corroborate evidence of a party who first presented evidence on the particular issue, or it may refute or deny some affirmative fact which an opposing party has attempted to prove. It may be used to explain, repel, counteract, or disprove testimony or facts introduced by or on behalf of the adverse party. Such evidence includes not only testimony which contradicts witnesses on the opposite side, but also corroborates previous testimony. The use and extent of rebuttal rests in the sound discretion of the trial court and its ruling will not be reversed unless it appears its discretion has been abused. [Citations omitted.]"

While Broyles points out that there were several nonincriminating explanations for his statement, such is not sufficient for this court to find the trial court abused its discretion. Where reasonable minds can differ, discretion has not been abused. *State v. Williams*, 268 Kan. 1, 8, 988 P.2d 722 (1999). It is not unreasonable to believe that Broyles' statement may very well have reflected an uncaring mind set. This would certainly be in contravention of evidence he earlier introduced tending to show his great love and affection toward his son. The trial court did not abuse its discretion in admitting this statement.

*Refusal to strike a biased venireperson for cause*

Broyles claim that he was deprived of due process because he had to use a peremptory strike to remove a potential juror whom

the trial court should have excused for cause is an issue that has been discussed in numerous recent cases and held to be without merit. See, *e.g.*, *State v. Donesay*, 270 Kan. 720, 725-26, 19 P.3d 779 (2001); *State v. Manning*, 270 Kan. 674, 690-95, 19 P.3d 84 (2001).

In these cases, the defendants contended they were denied due process by being forced to use peremptory challenges to strike what were claimed to be unqualified jurors. When challenges were used to strike these questionable venirepersons, we found no reversible error. We need not restate our previous holdings on this issue.

*Cumulative errors*

Defendant argues that he was prejudiced by cumulative trial errors. When reviewing cumulative errors, this court has held:

" 'Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial.' " *State v. Bedford*, 269 Kan. 315, 332-33, 7 P.3d 224 (2000) (quoting *State v. Lumbrera*, 252 Kan. 54, Syl. ¶ 1, 845 P.2d 609 [1992]).

The only potential error we have found was prosecutorial misconduct, and the effect of that error has been found to be harmless. Therefore, we need not make a cumulative error analysis.

This, like many criminal trials, was a difficult one, but as we have often said, an accused is entitled to a fair trial, not a perfect one. *State v. Chandler*, 252 Kan. 797, Syl. ¶ 3, 850 P.2d 803 (1993). We find no valid reason, based on our standards of review, to grant a new trial.

Affirmed.