No. 81,603

STATE OF KANSAS, *Appellee*, v. MICHAEL CAMPBELL, *Appellant*.

(997 P.2d 726)

Opinion filed February 11, 2000.

*Craig H. Durham,* assistant appellate defender, argued the cause, *Elizabeth Seale Cateforis,* assistant appellate defender, and *Jessica R. Kunen,* chief appellate defender, were with him on the brief for appellant.

*Sheryl L. Lidtke,* assistant district attorney, argued the cause, *Matthew J. Bock,* assistant district attorney, *Nick A. Tomasic,* district attorney, and *Carla J. Stovall,* attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

LARSON, J.: This is Michael Campbell's direct appeal of his conviction for the first-degree murder of Sharon Schmid. Campbell alleges discriminatory use of peremptory strikes, improper admission of testimony, violation of an order in limine, and prosecutorial misconduct during opening statements and closing arguments.

*Facts*

Sharon Schmid was shot and killed shortly before midnight on December 19, 1997, as she sat in the car of her sister, Paula Gustafson, in front of the duplex they shared. Gustafson heard gunshots, as did several neighbors. Gustafson testified she saw Michael Campbell running from the front door of her car and down the street. He was wearing dark, loose clothing, and his head was shaved in his usual manner.

Campbell and Gustafson had shared a long-term relationship that resulted in two children. Campbell had moved out of Gustafson's house 10 months prior to Schmid's death. He drove a tan over red Jeep Wrangler that had a spare tire on the back with a San Francisco 49'ers tire cover on it.

Gustafson testified that after Schmid moved in with her, Campbell was angry that Schmid was there. He said Schmid was now making the decisions about the relationship between himself and Gustafson.

Gustafson testified Campbell always carried a gun and had earlier taken two 9 mm weapons from her house. According to Gustafson, during the morning and afternoon preceding Schmid's mur-

der, Campbell had called twice and left messages with Schmid, but Gustafson had not returned the calls.

A neighbor two houses away from the Gustafson residence, Judy Malone, testified to hearing gunshots at the time of Schmid's death. She ran to the window and saw a car in front of the Gustafson residence and a person running from that car to a dark-colored Jeep. The Jeep had a tire cover with an NFL insignia and looked like the same Jeep she had observed in front of the Gustafson residence previously. The person she saw was dark-skinned, either bald or had very little hair, was wearing a dark jacket, and appeared to put something in his right pocket while running.

Verla Mae Harris and Mike Bruce lived four houses down from the Gustafson residence. On the night of the murder they heard several gunshots. Bruce testified they went to the window and observed Campbell, whom Bruce knew, running to a Jeep and then back the Jeep into their mailbox. Campbell was wearing dark clothes and appeared to have one hand in his pocket. Bruce testified that he knew Campbell's Jeep had a San Francisco 49'ers tire cover, but he could not see the back of the Jeep that evening. Bruce yelled out Campbell's name, but the driver did not respond and continued backing down the street. In his statement to the police, Bruce reported that Campbell had previously threatened to kill Schmid because he perceived her as keeping him away from Gustafson.

Harris testified that she went to the window and saw the side of the Jeep hit their mailbox. After Bruce went to the door and yelled out Campbell's first name, Harris then heard Bruce say, "Mike Campbell, oh, lord, what did he do."

Tim Stovall is a friend of Bruce and Campbell. Stovall's houseguest, Roy Hill, testified that on the night of the murder, sometime between midnight and 1 a.m., while Stovall was away, Campbell came to the house smelling of alcohol and wanted to use the phone. After using the phone, Campbell stepped out the back door and Hill observed Campbell walk toward a shed and bend over. Shortly thereafter, Campbell left.

Jocelyn Ingram, a mutual friend of Gustafson and Campbell, testified that Campbell lived with her in the fall of 1997 in a

brother/sister-type relationship. She testified that Campbell did not like Schmid, used to call her a "bitch," and had said that if Schmid were not around, he and Gustafson would probably be back together. According to Ingram, on the afternoon of Schmid's death, Campbell was upset because he had called Gustafson's home twice to find out what kind of toy his daughter wanted for Christmas. Each time he called, Schmid answered the phone and said Gustafson was not home and was out with "her man." Campbell told Ingram that he called a third time and asked to speak with his children, but Schmid would not let him do so.

After several witnesses at the scene identified Campbell, the police found Campbell at Ingram's house. She gave the police permission to search her home and car for Campbell's gun, but nothing was found.

The evening after the murder, Stovall received a call from Campbell, which was also partially heard by Bruce. Stovall testified that Campbell said he was calling from jail where he was held on a murder charge and there was a "thing" out behind Stovall's house. Campbell denied that he committed the murder, but asked Stovall, "[D]id you check out by the dog house for that thing?" Stovall checked near the shed but found nothing. However, when the police were informed by Stovall of the conversation, they searched the area with a metal detector and found a partially loaded 9 mm semi-automatic gun.

Schmid's autopsy revealed gunshot wounds and bullet fragments from a 9 mm gun. Forensic comparison of test rounds fired from the gun recovered at Stovall's house and of the bullets, fragments, and casings from the murder scene, revealed that the casings had been fired from that gun.

Campbell was charged, tried, and found guilty of the first-degree murder of Schmid. After a motion for a new trial was denied, Campbell filed this appeal.

*Did the trial court abuse its discretion in denying Campbell's Batson challenge to the State's use of peremptory strikes against African-American jurors?*

Campbell first challenges the State's use of peremptory strikes under the principles of *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed.

2d 69, 106 S. Ct. 1712 (1986). When a *Batson* challenge is raised, a three-step analysis applies. First, the defendant must make a prima facie showing that the prosecution has used peremptory challenges on the basis of race. Second, once such a showing has been made, the burden shifts to the prosecutor to articulate a race-neutral reason for striking the juror. Third, the trial court then decides whether the defendant has carried the burden of establishing purposeful discrimination. See *Batson*, 476 U.S. at 96-98, *State v. Edwards*, 264 Kan. 177, 192, 955 P.2d 1276 (1998).

Whether a prima facie showing has been made that the challenges were racially based is a question of legal sufficiency subject to plenary review, *State v. Sledd*, 250 Kan. 15, 21, 825 P.2d 114, *cert. denied* 506 U.S. 849 (1992), but the trial court's decision as to whether the State acted with discriminatory purpose is subject to an abuse of discretion standard of review. *State v. Walston*, 256 Kan. 372, Syl. ¶ 1, 886 P.2d 349 (1994). Judicial discretion is abused when the judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only when no reasonable person would take the view adopted by the trial court. *State v. Davidson*, 264 Kan. 44, 56, 954 P.2d 702 (1998).

The *Batson* analysis was recently elaborated on in *Purkett v. Elem*, 514 U.S. 765, 131 L. Ed. 2d 834, 115 S. Ct. 1769 (1995), and adopted by our court in *State v. Vargas*, 260 Kan. 791, 795, 926 P.2d 223 (1996). Under these cases, unless a discriminatory intent is inherent in the prosecutor's explanation, the reason given will be deemed race-neutral. The second step does not require an explanation that is persuasive. It is not at the second step where the validity of the strike is considered. It is at the third step where the burden of persuasion regarding the improper motivation for the strike rests with the opponent of the strike. Here, the judge should determine if the opponent of the strike has shown and proved purposeful discrimination. The ultimate burden of persuasion rests with, and never shifts from, the opponent of the strike. *Purkett v. Elem*, 514 U.S. at 767-68.

After defense counsel here raised its *Batson* challenge, the prosecutor stated she was not sure that the defense had made a prima facie showing but she was ready to give the court a reason for the

strikes if the court wished to proceed with the explanations. The trial court noted that it seemed three out of four African-Americans had been struck from the panel and asked the prosecutor to state her reasons. After reasons for three strikes were given, defense counsel raised a fourth name and the prosecutor then gave her reason for striking that person. After listening to the reasons given and the defense counsel's response, the trial court stated it was "not sure" there was reason in this case for making the *Batson* objection, but the court would answer the next question "just in case." The court then concluded the reasons given were race-neutral and stated it had tried to compare those struck to the ones remaining on the panel and it did not appear that any of the strikes were racially based.

Although the State argues on appeal that a prima facie showing was never made, Campbell more persuasively suggests this argument is moot because the prosecutor offered race-neutral explanations and the trial court ruled on the ultimate issue. It has been held that when the trial court rules on the ultimate question of discrimination, the preliminary issue of whether the defendant has made a prima facie showing becomes moot. *Hernandez v. New York*, 500 U.S. 352, 359, 114 L. Ed. 2d 395, 111 S. Ct. 1859 (1991); *State v. Edwards*, 264 Kan. 177, 194, 955 P.2d 1276 (1998). Because the trial court considered the *Batson* issue, we will also do so.

Where a prosecutor offers an explanation for striking a juror which does not relate to the characteristics of any particular race, such reason is race-neutral and it is then for the trial court to determine whether the prosecutor was motivated by some discriminatory intent—an analysis which is largely credibility based. See *Vargas*, 260 Kan. at 795-96. In conducting a *Batson* analysis, the court avoids placing a determinative emphasis on any one factor and the primary determination of whether the State acted with an unlawful discriminatory purpose during jury selection is in the hands of the trial court. *Vargas*, 260 Kan. at 795. "The trial judge can objectively compare numbers or other facts and subjectively evaluate the credibility of the State's counsel in explaining the rea-

sons for each challenged strike. [Citation omitted.]" *Vargas*, 260 Kan. at 795.

The percentage of a particular race on a panel compared with the percentage that ends up on the jury panel is not to be given conclusive weight, as we have held that no single factor is determinative. See *Walston*, 256 Kan. at 379; *Vargas*, 260 Kan. at 795.

With regard to comparability of challenged and unchallenged jurors, there is no indication that the defense here informed the trial court at the time of the *Batson* objection that there were non-stricken jurors of other races with characteristics similar to those cited by the State as race-neutral reasons for the strikes. As such, comparability forms a poor basis for attacking the trial court's decision on appeal. See *Walston*, 256 Kan. at 380-83. It is not the trial court's duty *sua sponte* to compare the information elicited from the other panelists with the characteristics named as reasons for striking the panelists whose removal is being challenged; the defendant has the burden to create the record of relevant facts and to prove its case to the trial court. *Walston*, 256 Kan. at 381-83.

In the present case, venireperson Styles' testimony showed her granddaughter had been molested but no one was ever charged, and she felt hurt that the crime was not solved. She also stated that she did not believe that anything about the experience would affect her judgment. The State's reason for striking venireperson Styles was: "Her granddaughter was molested. She is an elderly woman. I don't believe she's all that happy with the system." Defense counsel argued that the lady had not given any indication that she was unhappy with the system.

Campbell admits the record reveals no ages but argues that other jurors' work history would suggest their age may have been close to Styles.' The defense did not discuss with the trial court and did not compare Styles' age with that of the other jurors, and therefore failed to make a proper record regarding the comparative ages. Even if some jurors were of comparable age, none had expressed hurt at an unsolved crime involving their family. The reason given was race-neutral. The trial court, having viewed the demeanor of the prosecutor and the witness during voir dire and the *Batson*

inquiry, properly concluded the reason given was not a mere pretext for discrimination.

The stated reason for striking venireperson Cobin is that "[she] isn't employed. And the evidence in this case at some point would show the defendant is unemployed. I believe that might bring some sympathy for him." Defense counsel noted that Cobin had described herself as "currently unemployed" and had stated that her husband was employed.

All the other persons on the jury were currently employed, with the exception of a juror who was retired. The reason given for striking Ms. Cobin was race-neutral, distinguished her from other jurors, and bore some relevance to the evidence in the case.

The voir dire testimony showed that venireperson Toombs worked for municipal court as a bailiff and was a probation officer, he knew some police officers, his brother had some criminal legal problems at the state level, and he stated he knew the defense counsel professionally. The stated reason for striking Mr. Toombs was: "He had a brother-in-law who had been in trouble. He works for city court. And I don't know whether he's developed any sort of relationship with either defendants or the cops. And that's why I struck him." Defense counsel offered no response. The reasons given were race-neutral, none of the others who were selected for the jury described having relatives who had been in trouble with the law, and none had such a close connection to the criminal justice system.

Finally, venireperson Blackman was stricken "very simply because he's divorced. And in this case there is evidence of marital discord." All the other unstricken jurors were married with the exception of one who was single and one female who was divorced. Although Campbell questions on appeal why the State did not also strike the other divorced person, the evidence of discord between the defendant and the victim's sister was relevant and a divorced male might be more likely to side with the male defendant than a divorced female. The marital perspective of the two parties are not comparable, even though both were divorced. We hold the reason given was race-neutral and bore relevance to the case.

An examination of the reasons under our standard of review clearly shows that the trial court did not abuse its discretion in accepting the reasons regarding the four jurors being stricken or in concluding that purposeful discrimination had not occurred.

*Did the testimony by the victim's sister regarding verbal abuse and pushing and shoving by Campbell cause reversible trial error?*

Prior to trial, the State filed a notice of intent to introduce certain evidence of specific incidents of threats and violence by Campbell toward or in the presence of Gustafson and/or the victim Schmid. This was asked to be admitted under K.S.A. 60-455 or, alternatively, independent of K.S.A. 60-455, to establish the parties' relationship, to show defendant's continuing course of conduct, as res gestae, and to corroborate Gustafson's testimony.

At a pretrial hearing, detailed evidence was presented by the State showing several violent threats by Campbell against Gustafson and the stormy relationship during the time they had lived together.

Defense counsel asked the court to exclude all such evidence. The court noted the lack of evidence that there was an ongoing violent relationship between the defendant and the victim and held marital discord between Campbell and the victim's sister and any bad acts by Campbell in that regard were not admissible under K.S.A. 60-455 or for any other reasons.

Early during Gustafson's trial testimony, the prosecutor questioned her about Campbell's and her parting as follows:

"Q. All right. Could you describe for the jury then what happened and when that happened?
"A. It was in February of '97. I asked Mike to leave. He was not working. He was in a deep state of depression, becoming abusive verbally, some pushing and shoving.
"MS. ROE: Objection, your Honor.
"THE COURT: I'll overrule the objection at this time.
"Q. (By [the prosecutor]) Ms. Gustafson, did he leave the home?
"A. Yes, he did."

Campbell now argues that this answer was in violation of the trial court's pretrial ruling and that the trial court erred in overruling the objection. In considering this problem, our court ex-

plained in *State v. Lumley*, 266 Kan. 939, Syl. ¶ 7, 976 P.2d 486 (1999):

> "Where a proper question is asked, and an improper answer given, the only remedy of the aggrieved party is by motion to strike. It is impossible for the court to exclude in advance an improper answer to a proper question. The propriety of the answer cannot, in the nature of things, be determined before it is given."

We further stated that "if a witness answers a question so quickly that an objection cannot be made prior to the answer, a motion to strike is the proper remedy." 266 Kan. at 952-53.

The pattern of questioning at the opening of Gustafson's trial testimony was similar to the testimony at the pretrial hearings. The responses given at the pretrial hearing and at the trial were also similar. The question was not objectionable on its face, and the defense counsel cannot be faulted for failing to anticipate an improper answer. However, there was no specific objection after the answer, which is normally required, nor was a motion to strike entered, as would have been proper. We held in *State v. Moncla*, 262 Kan. 58, Syl. ¶ 1, 936 P.2d 727 (1997), that a verdict or finding will not be set aside, nor will the judgment be reversed, by reason of the erroneous admission of evidence in violation of a motion in limine unless an objection was properly made.

Even if the issue were viewed as preserved by the objection, this single answer was not so prejudicial as to require reversal in light of the record as whole. There is no indication that the answer substantially prejudiced the defendant, and the burden is on the defendant to show substantial prejudice. *State v. Warden*, 257 Kan. 94, Syl. ¶ 9, 891 P.2d 1074 (1995). The evidence against Campbell was overwhelming and a brief comment that he had engaged in "some pushing and shoving" would not have changed the result and did not substantially prejudice his right to a fair trial.

*Was there prosecutorial misconduct during closing argument warranting reversal?*

Campbell next argues that the prosecutor made improper statements during closing argument. Although the defense failed to make contemporaneous objections to these statements at trial,

Campbell now asserts the statements were so far outside the limits of professional discussion that the trial court had a duty to take action irrespective of any objection by the defense.

We recently reviewed our standard of review for prosecutorial misconduct during closing argument. See *State v. Pabst*, 268 Kan. 501, 996 P.2d 321 (2000). In *Pabst*, we said:

> "Reversible error predicated on prosecutorial misconduct must be of such a magnitude as to deny a defendant's constitutional right to a fair trial. See *State v. Sperry*, 267 Kan. 287, 308, 978 P.2d 933 (1999). Some complained-of prosecutorial statements were not objected to at trial. If the claimed error has been determined to implicate a defendant's right to a fair trial, our standard of review is the same whether or not an objection was made at trial. If the claimed error rises to the level of a denial of the Fourteenth Amendment right to due process, the issue will be addressed. *State v. McCorkendale*, 267 Kan. 263, Syl. ¶ 6, 979 P.2d 1239 (1999).
>
> . . . .
>
> "The analysis of the effect of a prosecutor's alleged improper remarks in closing argument is a two-step process. First, we decide whether the remarks were outside the considerable latitude the prosecutor is allowed in discussing the evidence. In criminal trials, the prosecution is given wide latitude in language and in manner or presentation of closing argument as long as the argument is consistent with the evidence. Second, we must decide whether the remarks constitute plain error; that is, whether they are so gross and flagrant as to prejudice the jury against the accused and deny a fair trial, requiring reversal. *State v. Lumley*, 266 Kan. 939, Syl. ¶ 12, 976 P.2d 486 (1999)." 268 Kan. at 505.

In deciding whether improper remarks constitute harmless error, each case must be scrutinized on its particular facts and the reviewing court must be able to find beyond a reasonable doubt that, in light of the record as a whole, the error had little, if any, likelihood of changing the result of the trial where harmless error is found.

The following italicized statements are the ones defendant argues are sufficiently prejudicial to require reversal:
Regarding Judy Malone:

> "Then you heard from Judy Malone. Judy Malone lived only two doors from [the victim's residence]. Judy doesn't know the victim in this case, Sharon Schmid. She doesn't know the victim's sister[,] Paula Gustafson. She didn't know the defendant. When she said she didn't know them, she meant I have never spoken with them. What motive would Judy Malone

have to come in here and tell you something that wasn't true about what she saw that night?

"She told you she heard the gunshots at 11:36. She looked at her clock. She went to her window. And what did she see? She saw a black man, bald, with a short coat, running from a car that was running. . . . What does she describe to you distinguishable about that Jeep? It had a spare tire cover. She couldn't tell you the name of the NFL team, but she told you it was an NFL football team.

"*She is not lying about what she saw. She has no motive to come and tell you anything but the truth. She doesn't know the people, doesn't have an interest in the outcome. She came to tell you the truth about what she saw this night. She saw this man running putting his hand in his pocket.*" (Emphasis added.)

## Regarding Michael Bruce:

"You heard from Mike Bruce. You got to see Mike Bruce in person. You got to see how reluctant he was to be here. He told you he was the defendant's friend. He called him an acquaintance, but he's his friend. He had been to his house. Michael Campbell had been to his house. He hung out with him. He knew Michael Campbell.

"What does he tell you about what he saw the evening of the 19th? . . .

. . . .

"Mike Bruce told you. He testified at preliminary hearing to the same thing. He saw Mike Campbell running from the car after the shots are fired, saw him get in the red Jeep with the tan cover.

. . . .

". . . Saw the red Jeep back up, hit his mailboxes, and continue in reverse down the street.

"He came here. *And what did he tell you here? He told you he saw Mike Campbell. You saw how reluctant he was. Why would he come in here and lie about something like this? This is his friend. If anything he'd come and say I never said any of that. That's not what he said though. He came in here and told you. It was hard to drag information from him. You got to watch him on the stand. It's his friend, but he came in here and he told you the truth.*" (Emphasis added.)

## Regarding Jocelyn Ingram:

"*You heard from Jocelyn Ingram. Now, Jocelyn told you she loved the defendant. She considered him like a brother. Play brothers is the term she used. Why would Jocelyn come in here and tell you anything other than the truth? She loved the defendant.*" (Emphasis added.)

We need not restate the law which is fully set forth in *Pabst*. The comments in this case do not rise to the level of those in *Pabst*. The comments were made without objection and fall under our contemporaneous objection rule. Furthermore, none of the comments about Malone, Bruce, or Ingram's testimony could be characterized as "vouching" for their credibility. All of the complained of remarks were within the considerable latitude allowed by counsel during closing argument and were not erroneous. Neither a harmless error analysis nor a clear error analysis is required.

*Is reversal warranted by the prosecutor's opening statements referring to testimony that was not later forthcoming?*

In his final issue, Campbell contends the prosecutor's reference during opening statements to anticipated testimony that did not, in fact, come about, constituted reversible error. Included in the opening presentation was the following statement:

> "You're going to hear Mike Bruce and Tim Stovall tell you about a conversation they had with the defendant while the defendant was in jail. The day after the homicide occurs, he makes a phone call to Tim Stovall's house. And while he's talking with Tim Stovall, Mike Bruce is in the room also and he puts the defendant Mike Campbell on speaker phone and this is what he says to them. He says, man, I shot babe in the face. That's what you are going to hear."

However, the testimony of Bruce and Stovall did not pan out exactly as the prosecutor evidently expected. When Stovall was testifying about the phone call received from Campbell, the prosecutor was able to elicit details regarding a "thing" being behind the house, but could not elicit any additional statement.

Bruce testified that he was at Stovall's house when Campbell called and that after Stovall put on his speaker phone, Bruce heard Campbell say that he had been charged with a first-degree murder he did not commit. Bruce said that Campbell then asked if Stovall had checked out by the doghouse for that "thing." Nothing additional was claimed to be overheard. Campbell notes on appeal that there was no testimony by either party that Campbell said to them, "[M]an, I shot babe in the face." Campbell asserts that the prosecutor told the jury about a supposed confession which was un-

supported by any evidence and that the jury was given the impression that Stovall and Bruce may have changed their testimony.

As often occurs in trial, the proof a party anticipates does not always materialize. We have stated in this regard:

> "In a criminal action proof which the prosecuting attorney anticipates in the trial of the case frequently fails to come up to expectations, and the tendency is to permit the prosecuting attorney a reasonable latitude in stating to the jury the facts he proposes to prove. Where no substantial prejudice results, and there is nothing to show the prosecuting attorney acted in bad faith, appellate courts usually refuse to reverse or remand a case for trial because of a reference by the prosecuting attorney to matters which he subsequently made no attempt to prove, or for some reason or another was unable to prove." *State v. Campbell*, 210 Kan. 265, Syl. ¶ 9, 500 P.2d 21 (1972).

See also, *State v. Pink*, 236 Kan. 715, Syl. ¶ 4, 696 P.2d 358 (1985), *overruled in part on other grounds State v. Van Cleave*, 239 Kan. 117, 716 P.2d 580 (1986) (absent substantial prejudice, there must be a showing of bad faith before relief may be granted for unproven opening statement remarks).

It is clear from the prosecutor's questions that she expected to elicit testimony from both Stovall and Bruce that was more incriminating than each testified to. However, there is no evidence of bad faith and Campbell does not claim such but insists that the statement was, nevertheless, extremely prejudicial and denied him a fair trial.

The statement was prejudicial; however, the evidence against Campbell was strong. In addition, the trial court told the jury prior to opening statements and again in the jury instructions that argument and comments of counsel were not evidence and were intended merely to help the jury understand the evidence in applying the law. The jury was instructed that any statements made by counsel that were not supported by the evidence should be disregarded. Given the instruction to the jury and the weight of the evidence against Campbell, there is little likelihood that the prosecutor's statement changed the result of the trial, or substantially prejudiced Campbell's right to a fair trial. There clearly was no showing of bad faith in this case. Under these facts, the un-

proven portion of the opening statement does not constitute reversible error or the basis for a new trial.

Affirmed.