No. 98,770

STATE OF KANSAS, *Appellee*, v. JAMES MATTHEW SIMMONS, *Appellant*.
(254 P.3d 94)

Review of the judgment of the Court of Appeals in an unpublished opinion filed April 10, 2009. Opinion filed July 8, 2011.

*Shawn E. Minihan*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Reina Probert*, deputy county attorney, argued the cause, and *Brian P. Duncan*, assistant county attorney, *John D. Gutierrez*, county attorney, and *Steve Six*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

NUSS, C.J.: A jury convicted James Simmons of two counts of rape and one count of misdemeanor theft. Simmons appealed several issues, including five claims of prosecutorial misconduct during trial. The Court of Appeals affirmed Simmons' convictions. We granted Simmons' petition for review under K.S.A. 20-3018(b) on the prosecutorial misconduct claims only, obtaining jurisdiction under K.S.A. 60-2101(b).

We hold that prosecutorial misconduct denied Simmons a fair trial; we reverse and remand for a new trial.

## FACTS

On August 5, 2006, Simmons attended a house party in Pittsburg, Kansas. According to A.H., Simmons tried to strike up a conversation with her, but she told him to leave her alone. Simmons persisted, and this prompted A.H. to leave the party at 2 a.m. and walk home alone.

A.H. testified that during her walk, an unknown car pulled up alongside her on a dimly lit street. A man left the car, ran toward her, grabbed her hair, and ordered her into the car at gunpoint. Once inside, the dome light illuminated the man's face, and A.H. recognized Simmons as her captor. Two persons unknown to A.H. were also in the car.

According to A.H., she was taken to a house she did not recognize where Simmons directed her into the bedroom. Simmons ordered her to undress. After she disrobed, he forced her to perform oral sex on him. He later told her to lie on her back while they had vaginal intercourse. Later that morning, Simmons ordered A.H. back into the bedroom. There he performed oral sex on her, followed by vaginal intercourse. A.H. testified that she was not allowed to leave the house, later identified as Jesse Switzer's, and that all the sexual acts were nonconsensual. By contrast, Simmons testified that the acts involving A.H. were all consensual.

A.H. testified that later that day, a vehicle stopped at the house and Simmons ordered A.H. into the vehicle. They were taken to another house where they both engaged in drug use. According to A.H., she went into a bathroom to shower and then Simmons en-

tered the shower and forced vaginal intercourse. After the shower, A.H. went to the living room and fell asleep. When she awoke, she did not see Simmons, and she ran out the back door and contacted police.

The State charged Simmons with three counts of rape, one count of aggravated kidnapping, and one count of aggravated criminal sodomy. It also charged him with one count of misdemeanor theft, claiming that he had stolen the gun he used to force A.H. into the car and intimidate her during several of the later crimes.

A jury found Simmons guilty of theft and guilty on two of the three rape counts, but it was unable to reach a unanimous decision on the third count. It acquitted him on the aggravated kidnapping and aggravated criminal sodomy counts.

The Court of Appeals affirmed in *State v. Simmons*, No. 98,770, 2009 WL 981685 (2009) (unpublished opinion). We granted Simmons' petition for review on the prosecutorial misconduct claims only.

More facts will be added as necessary to the analysis.

## ANALYSIS

*Issue: Prosecutorial misconduct denied Simmons a fair trial.*

Simmons identifies five instances of alleged prosecutorial misconduct. The State argues that four of the instances are not prosecutorial misconduct. It concedes that the remaining instance was misconduct, but nevertheless harmless.

We recently outlined our two-step analysis for prosecutorial misconduct claims in *State v. McCaslin*, 291 Kan. 697, 715, 245 P.3d 1030 (2011):

" 'Allegations of prosecutorial misconduct require a two-step analysis. First, the appellate court must determine whether the comments were outside the wide latitude allowed in discussing the evidence. Second, the appellate court must decide whether those comments constitute plain error; that is, whether the statements prejudiced the jury against the defendant and denied the defendant a fair trial, thereby requiring reversal. *State v. Elnicki*, 279 Kan. 47, 58, 105 P.3d 1222 (2005) (quoting *State v. Tosh*, 278 Kan. 83, 85, 91 P.3d 1204 [2004]). We have applied the test to prosecutorial action in contexts beyond mere comment on the evidence. See *State v. Swinney*, 280 Kan. 768, 779, 127 P.3d 261 (2006) (citing cases).' *State v. White*, 284 Kan. 333, 337-38, 161 P.3d 208 (2007)."

We have provided specific guidance on when to grant a new trial on this basis:

" 'In the second step of the two-step prosecutorial misconduct analysis, the appellate court considers three factors to determine whether a new trial should be granted: (1) whether the misconduct is gross and flagrant; (2) whether the misconduct shows ill will on the prosecutor's part; and (3) whether the evidence against the defendant is of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jurors. None of these three factors is individually controlling. Before the third factor can ever override the first two factors, an appellate court must be able to say that the harmlessness tests of both K.S.A. 60-261 (inconsistent with substantial justice) and *Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967) (conclusion beyond reasonable doubt that the error had little, if any, likelihood of having changed the results of the trial) have been met.' *State v. Bryant*, 285 Kan. 970, Syl. ¶ 2, 179 P.3d 1122 (2008)." *McCaslin*, 291 Kan. at 715-16.

Effective July 1, 2010, the language expressing the standard for reversible error changed in K.S.A. 60-261. Previously the statute stated that error would not be ground for granting a new trial "unless refusal to take such action appears to the court inconsistent with substantial justice." Now the statute provides that error will not be ground for granting a new trial "[u]nless justice requires otherwise." K.S.A. 2010 Supp. 60-261. Despite the language change, our general requirement remains unchanged: the statutory standard must be met before a new trial may be granted.

We review each claim of misconduct in turn.

*Prosecutor's discussion of Stockholm Syndrome during voir dire*

During voir dire, the prosecutor asked if anyone had a background in psychology or social work. Two venirepersons responded affirmatively. Following brief questions to them, the following colloquy occurred concerning Stockholm Syndrome:

"[Prosecutor]: Is anybody in this pool that's sitting in front of me familiar with what they call the Stockholm Syndrome? Has anyone heard of that? You are shaking you[r] head. What is it?

"[Potential juror]: It's where the victim identifies with the perpetrator.

"[Prosecutor]: All right.

"[Potential juror]: And that she—she or he will not have any vengeance or will actually fall in love with that person.

"[Prosecutor]: That's absolutely correct. You are very correct. Boils it down."

The prosecutor then asked about the Patty Hearst case, which concerned the kidnapping of a young California woman who later appeared in a bank robbery with her kidnappers:

"[Prosecutor]: Does anybody in this pool remember Patty Hurst [*sic*]? Sir, you're nodding you[r] head. What did Patty Hurst [*sic*] do?

. . . .

"[Potential juror]: She was kidnapped and then became a supposed member of the kidnapping gang.

"[Prosecutor]: That's correct. What—did she walk into a bank at one time with that group?"

"[Potential juror]: Yes.

"[Prosecutor]: What was she holding when she went in that bank?

"[Potential juror]: Some firearm.

"[Prosecutor]: Yes. Firearm. She robbed that bank with that group, didn't she? She came from a respectable family, didn't she?

"[Potential juror]: Well—

"[Prosecutor]: Again, a very well and respectable family, the Hearst family.

"[Potential juror]: Yes."

The prosecutor next told the jury panel they should view certain trial evidence in light of the Stockholm Syndrome:

"[Prosecutor]: You are going to possibly hear evidence that maybe the victim identified at times with her alleged captor, *and I ask that you view that evidence in light of the Stockholm Syndrome and like, you know, people in that situation, that are put in that situation.*" (Emphasis added.)

The prosecutor promptly provided another real life example, the Shawn Hornbeck matter, that also purportedly illustrated the syndrome:

"[Prosecutor]: I am going to talk about a more recent event. How about the event with this Michael Devlin, Shawn Hornbeck up in Saint Louis? Everybody pretty much familiar with that incident, where the gentleman had taken Shawn Hornbeck about four years ago and stayed at the apartment? Does that ring a bell with everybody? And during the course of the time, Mr. Devlin is going to make it easy, and *this kid is just sitting there. Everybody's in the media is saying, how could that kid be kidnapped? Why is he staying there?*

"And, you know, can I see a show of hands how many people believe he was actually kidnapped and was staying there on his own? How many of you folks think that?" (Emphasis added.)

The court then interrupted to advise the prosecutor that asking the venirepersons' beliefs in an on-going case was probably inappropriate, and counsel moved to another part of the voir dire.

Simmons now contends the discussion of the Stockholm Syndrome during voir dire constitutes misconduct for several reasons. He argues it was irrelevant to discovering juror prejudice or bias. He also argues the State did not present any evidence whatsoever of the syndrome at trial—what it is and whether A.H. suffered from it—and that the vernireperson's definition of the syndrome was incorrect. Simmons further contends that during voir dire the State essentially presented evidence of the syndrome as it related to A.H. without subjecting it to the *Frye* test. See *State v. Shadden*, 290 Kan. 803, 818-19, 235 P.3d 436 (2010) (K.S.A. 60-456 governs admissibility of all opinion testimony, but opinions based on scientific methods or procedures must be scrutinized under the test articulated in *Frye v. United States*, 293 F. 1013 [D.C. Cir. 1923].).

The State responds that the Stockholm Syndrome discussion was relevant to discovering whether jurors would be biased for or prejudiced against A.H. It was also purportedly relevant to the eventual testimony of trial witness, Jesse Switzer, that A.H. rubbed Simmons' back while sitting on the couch in Switzer's house and called him "baby."

The Court of Appeals panel agreed with the State, holding the discussion was not improper. It noted the discussion's connection to the back rubbing episode and further held that the questioning was relevant to determining whether the potential jurors were biased, partial, or prejudiced against the victim. *Simmons*, 2009 WL 981685, at *5.

We begin our analysis of this episode by determining whether the prosecutor committed misconduct. See *McCaslin*, 291 Kan. at 715. Like the Court of Appeals, we note that the purpose of voir dire is to enable the parties to select jurors who are competent and without bias, prejudice, or partiality. *State v. Reyna*, 290 Kan 666, 686, 234 P.3d 761 (2010). In reviewing whether the trial court has taken sufficient measures to assure that the accused is tried by an impartial jury free from outside influences, appellate tribunals have the duty to make an independent evaluation of the circumstances.

*Reyna*, 290 Kan. at 686. We have applied prosecutorial misconduct standards to the voir dire process. See, *e.g.*, *State v. McReynolds*, 288 Kan. 318, 323, 202 P.3d 658 (2009).

Unlike the Court of Appeals, however, we must conclude the prosecutor's examples and statements about Stockholm Syndrome and his colloquy with potential jurors about it constituted misconduct for a number of reasons. Several will suffice. At the outset, we reject the State's position that the prosecutor merely was probing for juror prejudice against people who, although held captive, exhibited signs of positive feelings toward their captors. We acknowledge such probing is a legitimate prosecutorial function. See *Reyna*, 290 Kan. at 686. According to the commentary to the ABA Standards for Criminal Justice, Prosecution Function and Defense Function, Standard 3-5.3(c) (3d ed. 1993): "Treatment of legal points in the course of voir dire examination should be strictly confined to those inquiries bearing on possible bias in relation to the issues of the case."

Simmons correctly points out, however, the prosecutor went much farther than probing. The prosecutor told the jury panel they should use the syndrome as their lens when they examined certain evidence, "I ask that you view that evidence [that maybe A.H. identified at times with her alleged captor, Simmons] in light of the Stockholm Syndrome." As a result, the prosecutor's comments can fairly be characterized as improper argument of an important part of his case to the panel. See ABA Standards for Criminal Justice, Prosecution Function and Defense Function, Standard 3-5.3(c) ("A prosecutor should not intentionally use the voir dire to . . . argue the prosecution's case to the jury."). At a minimum, he essentially argued that despite inferences that could be drawn by the panel from certain evidence, A.H.'s participation in the sex acts forming the basis for four of the charged crimes was not truly voluntary because her captivity caused her to psychologically identify with Simmons. See K.S.A. 21-3502(a)(1)(A) (rape is sexual intercourse with person who does not consent . . . when victim overcome by force or fear); K.S.A. 21-3506(a)(3) (aggravated criminal sodomy is sodomy without consent . . . when victim overcome by force or fear).

Equally important to our misconduct analysis, the prosecutor was improperly referring to facts that were never in evidence. This prohibition applies to all lawyers. See Rule 3.4(e) of Supreme Court Rules Relating to Discipline of Attorneys (KRPC) ("A lawyer shall not . . . (e) in trial, allude to any matter that . . . will not be supported by admissible evidence.") (2010 Kan. Ct. R. Annot. 552). This prohibition especially applies to prosecutors. See *McCaslin*, 291 Kan. at 717; ABA Standards for Criminal Justice: Prosecution Function and Defense Function, Standard 3-5.3(c) ("A prosecutor should not intentionally use the voir dire to present factual matter which the prosecutor knows will not be admissible at trial . . . ."). That Standard's Commentary expresses the rationale for the prohibition: "The use of voir dire to inject inadmissible evidence into the case is a substantial abuse of the process." Accord National District Attorneys Association National Prosecution Standards, Standard 6.2.2(b) (3d ed. 2009) (www.ndaa.org/publications.html) ("A prosecutor should not . . . intentionally use the voir dire process to present information that he or she knows will not be admissible at trial.").

We recently warned of the dangers of this prosecutorial practice in *State v. Huerta-Alvarez*, 291 Kan. 247, 263, 243 P.3d 326 (2010):

" '[W]hen a prosecutor refers to facts not in evidence, such statements tend to make the prosecutor his or her own witness who offers unsworn testimony not subject to cross-examination. See [*State v.*] *Pabst*, 268 Kan. [501, 510, 996 P.2d 321 (2000)]; *People v. Hill*, 17 Cal. 4th 800, 828, 72 Cal. Rptr. 2d 656, 952 P.2d 673 (1998). This unsworn testimony, " ' "although worthless as a matter of law, can be 'dynamite' to the jury because of the special regard the jury has for the prosecutor, thereby effectively circumventing the rules of evidence." ' [Citations omitted.]" 17 Cal. 4th at 828.' *State v. Morris*, 40 Kan. App. 2d 769, 791-92, 196 P.3d 422 (2008)."

Here, the results of the prohibited prosecutorial practice of referring to facts not in evidence were exacerbated by the nature of the facts themselves. The prosecutor's agreement with the definition of the Stockholm Syndrome—provided by a venireperson possessing a psychology or social work background—implied to the panel that the syndrome was a recognized medical term and the definition was indisputable. See *Huerta-Alvarez*, 291 Kan. at 263

(prosecutor's unsworn testimony is dynamite because of the special regard jury has for prosecutor). But according to one peer-reviewed article, there is "ambiguity in the use of the term" and "although research into hostage situations does occur, the term 'Stockholm syndrome' is rarely used or recognized in academic research." Namnyak, *'Stockholm Syndrome': Psychiatric Diagnosis or Urban Myth?*, 117 Acta Psychiatrica Scandinavica 4, 6 (Sweden 2008). We also independently observe the term does not appear in the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) (4th ed. 2000).

More regrettably, the prosecutor's overall comments implied he was an authority on the Stockholm Syndrome and was capable of diagnosing an individual as suffering from this purported condition. He clearly was neither. Ironically, the Hearst and Hornbeck cases the prosecutor discussed with the panel were two of those the journal authors studied before concluding: "No validated diagnostic criteria for 'Stockholm syndrome' have been described; existing literature is of limited research value and does little to support 'Stockholm syndrome' as a psychiatric diagnosis." 117 Acta Psychiatrica Scandinavica, p. 4.

The panel could additionally infer from the prosecutor's overall comments that he was diagnosing A.H. as such a sufferer. Asking the panel to "view that evidence in light of the Stockholm Syndrome [from which she suffered]." is also improper conduct. See KRPC 3.4(e) (2010 Kan. Ct. R. Annot. 552) ("A lawyer shall not . . . (e) in trial . . . assert personal knowledge of facts in issue except when testifying as a witness or state a personal opinion as to the justness of a cause, the credibility of a witness . . . or the guilt or innocence of an accused."); *cf. State v. Tosh*, 278 Kan. 83, 86, 91 P.3d 1204 (2004) (misconduct for prosecutor in cross-examination of defense witness to ask, " 'Well, we've rested our case, so we've proven that he raped his daughter, kidnapped his daughter and raped her again. You're aware of that, right?' ").

Finally, we have stated that "[w]hen a prosecutor argues facts that are not in evidence, this court has consistently found that 'the first prong of the prosecutorial misconduct test is met.' " *State v. King*, 288 Kan. 333, 351, 204 P.3d 585 (2009). We hold under these

circumstances where a prosecutor *refers* to facts not in evidence, that the first prong of the prosecutorial misconduct test also is met. See, *e.g.*, *McCaslin*, 291 Kan. at 717-18 (after noting KRPC 3.4[e], held prosecutorial misconduct to tell defendant on cross-examination that he had " 'walked in on more bodies like that than I have.' "); *State v. Smith*, 258 Kan. 321, 323-24, 904 P.2d 999 (1995) (after noting Rule 3.4[e], held that prosecutor's reference to purported Bible verse in his question during cross-examination of defendant was "clearly improper," but not reversible, conduct).

Now that we have established the existence of prosecutorial misconduct, we proceed to step two of the analysis: whether the misconduct was of sufficient magnitude to require reversal and a new trial. See *McCaslin*, 291 Kan. at 718.

In support of the State's contention that the error was not reversible, it analogizes its discussion of Stockholm Syndrome to the discussion of Munchausen Syndrome in the first-degree murder case of *State v. Lumbrera*, 252 Kan. 54, 845 P.2d 609 (1992). There, the prosecutor offered two possible motives for the defendant's smothering her 4-year-old son to death, including that she suffered from Munchausen Syndrome by Proxy. During the prosecutor's opening statement, he claimed defendant had a need to obtain sympathy—which he believed was Munchausen Syndrome by Proxy. He also informed the jury that the State would present evidence on the syndrome during trial. He then laid out what that lay evidence would be.

The State later presented these lay fact witnesses during its case-in-chief. Over objection, it also presented testimony of a physician who defined Munchausen Syndrome and distinguished it from Munchausen Syndrome by Proxy. The physician explained that in the former, the individual fakes an illness or self-inflicts injury to become the center of attention, while in the latter, a parent fakes or inflicts an illness for the child so the parent becomes the center of attention.

The State did not present any expert testimony attempting to prove Lumbrera suffered from either syndrome. The district court then granted Lumbrera's motion to strike all testimony on either syndrome and to strike their references in an exhibit. The court

explained the State had not laid a foundation for the purpose of the syndrome testimony, instructed the jury to disregard the physician's testimony about it, and ordered the jury to remove that term from their consideration.

We first rejected Lumbrera's argument that the error in admitting this evidence was not overcome by the striking of the physician's testimony and by the court's jury admonition to disregard. More important to the instant case, we also rejected her argument that the prosecutor's mention of Munchausen Syndrome during his opening statement was reversible error. We pointed out the State later introduced lay witness testimony into evidence at trial supporting its theory that the obtaining of sympathy was a motive for the crime—what the State "said it would do in its opening statement." 252 Kan. at 68. We observed that all the evidence relative to the syndromes had been stricken and the jury admonished to disregard it. We concluded:

"There is no showing of substantial prejudice to the defendant from the brief reference to the syndrome in the opening statement or bad faith on the part of the prosecutor. *Error there was, but standing alone the issue raised relative to the Munchausen Syndromes does not rise to the status of reversible error.*" (Emphasis added.) 252 Kan. at 68.

The *Lumbrera* court heavily relied upon the standard articulated in *State v. Pink*, 236 Kan. 715, 724, 696 P.2d 358 (1985), *overruled in part on other grounds by State v. VanCleave*, 239 Kan. 117, 119, 716 P.2d 580 (1986). The *Pink* court held:

"Absent substantial prejudice to the rights of a defendant, there must be a showing of bad faith on the part of the prosecutor before relief may be granted as a result of a prosecutor's reference in his opening statement to matters not provable or which he does not attempt to prove during the trial. [Citations omitted.]" 236 Kan. at 724.

This court later made a similar statement in the decision principally relied upon by the Court of Appeals in the instant case, *State v. Campbell*, 268 Kan. 529, 542, 997 P.2d 726, *cert. denied* 531 U.S. 832 (2000):

" 'In a criminal action proof which the prosecuting attorney anticipates in the trial of the case frequently fails to come up to expectations, and the tendency is to permit the prosecuting attorney a reasonable latitude in stating to the jury the

facts he proposes to prove. Where no substantial prejudice results, and there is nothing to show the prosecuting attorney acted in bad faith, appellate courts usually refuse to reverse or remand a case for trial because of a reference by the prosecuting attorney to matters which he subsequently made no attempt to prove, or for some reason or another was unable to prove.' [Citation omitted.]"

The decisions in *Pink*, *Lumbrera*, and *Campbell* all predate our clarification, and standardization, of the multi-step prosecutorial misconduct test in *Tosh*, 278 Kan. 83, Syl. ¶¶ 1-2. We see no valid reason for maintaining a separate, incomplete *Tosh* test for this specific scenario. Accordingly, the tests stated and applied in those decisions are now clarified: we apply the *Tosh* test.

That said, our facts are easily distinguishable from *Lumbrera*'s. Unlike *Lumbrera*, here the prosecutor never made any effort to introduce *any* evidence about the syndrome during trial. Not only was no evidence ever presented about the Stockholm Syndrome, but there is also no indication that the State ever possessed any evidence about the syndrome in general or about how the syndrome related to A.H. specifically, much less an indication that the State intended to present such evidence for admission. Indeed, during defense counsel's turn during voir dire, he told the panel that while the prosecutor had mentioned the syndrome to them, the State was required to share its information with him, and he had not been informed of the testimony of any psychologist or psychiatrist for the State. He effectively told them that as a result, little information on the syndrome would likely be provided at trial. Compare *McCaslin*, 291 Kan. at 720-22 (State's response to new trial motion suggested witnesses had existed to establish the unsupported factual statements made by prosecutor during trial). And unlike *Lumbrera*, here nothing was done to cure the problems caused by the discussion about the syndrome.

Step two of our *Tosh* analysis—whether the statements sufficiently prejudiced the jury against Simmons to deny him a fair trial—specifically allows us to consider whether the prosecutor's misconduct is gross and flagrant. See *McCaslin*, 291 Kan. at 721-22 (citing *Tosh*, 278 Kan. at 93-95). The prosecutor's multiple references to the Stockholm Syndrome, including his providing the panel with some details of two actual criminal cases allegedly il-

lustrating the condition, compel us to conclude his conduct was gross and flagrant. See *State v. Madkins*, 42 Kan. App. 2d 955, 961, 219 P.3d 831 (2009) ("[I]n evaluating whether a comment was gross and flagrant, Kansas courts often consider whether the prosecutor repeated or emphasized the misconduct.").

Step two of our *Tosh* analysis also specifically allows us to consider whether the prosecutor's misconduct demonstrates ill will. See *McCaslin*, 291 Kan. at 721-22 (citing *Tosh*, 278 Kan. at 93-95). Although a harder question here, we conclude that it does. With absolutely no effort to introduce evidence on the issue, the prosecutor appeared to establish a definition of Stockholm Syndrome through a potential juror, appeared to make the definition unassailable by openly agreeing with it, and appeared to diagnose two other real-life crime victims and A.H. as suffering from the syndrome. He then expressly asked the panel to view certain evidence against A.H. "in light of the Stockholm Syndrome" as defined by the venireperson and himself—an intentional, improper use of voir dire to argue an important part of his case to the jury. See, *e.g.*, ABA Standards for Criminal Justice, Prosecution Function and Defense Function, Standard 3-5.3(c).

Whether this otherwise constituted reversible misconduct, *i.e.*, after reviewing the amount of the evidence in light of the state and federal standards, as articulated in *Tosh*, will be discussed later in the opinion. See *McCaslin*, 291 Kan. at 718, 722.

*Prosecutor's closing argument comment about A.H. showering*

During the prosecutor's closing argument, he discussed the alleged rape that occurred when A.H. was showering:

"After [Simmons] washes [A.H.], he ordered her to turn around, face the shower with the shower coming down into her face, spreads her legs, proceeds to rape her from behind. And you and I take showers every day. We take it for granted. The things we worry about, am I going to run out of hot water? Am I going to stay in the shower too long and make it late to work? *But now, every day that* [A.H.] *takes a shower, what do you think she is thinking about?*" (Emphasis added.)

The court immediately interrupted and instructed the jury to disregard the comment about what A.H. would be thinking during her future showers and not to consider it during deliberations.

Simmons argues that the prosecutor committed misconduct with this statement because it "appealed to the jury's sense of compassion for the alleged victim," which in turn, prejudiced his right to a fair trial.

In its appellate brief, the State concedes "for [the] sake of argument" that the prosecutor's remark was improper. Citing a number of cases, the State contends the error was harmless at best because of the district court's interruption and instruction to disregard.

The Court of Appeals panel agreed with the State, determining that the trial court's admonition to disregard cured any prejudicial impact from the prosecutor's statement. See *State v. Jordan*, 250 Kan. 180, 195-96, 825 P.2d 157 (1992) (Improper remarks uttered by the prosecutor on final summation will not constitute reversible error where the jury has been instructed to disregard the same, unless the remarks were so prejudicial as to have been incurable.). Citing *State v. Gleason*, 277 Kan. 624 ,642, 88 P.3d 218 (2004), the court held Simmons had not met his burden to show the statement's prejudice was incurable. *Simmons*, 2009 WL 981685, at *5.

We have held that a prosecutor crosses the threshold of appropriate argument when the argument is intended to inflame the passions or prejudices of the jury "or when the argument diverts the jury's attention from its duty to decide the case on the evidence and controlling law. [Citation omitted.]" *State v. Martinez*, 290 Kan. 992, 1014-15, 236 P.3d 481 (2010). Accordingly, a prosecutor commits misconduct during closing argument when, in effect, he or she asks the jury to base its deliberations on sympathy for the victim or victim's family or to otherwise argue the impact of a crime on a victim or victim's family. See *State v. Adams*, 292 Kan. 60, 67-68, 253 P.3d 5 (2011) (citing cases).

Given this case law, we readily conclude the prosecutor's comment about A.H. in future showers constituted misconduct. The comments are at least as serious as the prosecutor's comments in *State v. Adams*. We held those were an improper appeal for sympathy for the victim and therefore diverted attention from the jury's function of determining guilt based on the instructions:

" 'This case doesn't just mean something to the defendant. It means something to Ratsamy Phanivong [victim.] This is the only chance he will ever have to have someone held accountable for taking his life. So this day is as much about him if not more than anyone else.' " 292 Kan. at 67-68.

As for whether the trial court's jury admonition to disregard the shower comment actually cured the prejudice, we cannot isolate this instance of prosecutorial misconduct from his voir dire misconduct discussed earlier. We observe that the second general step in *Tosh*—whether the prosecutor's comments sufficiently prejudiced the jury against Simmons to deny him a fair trial—is similar to our inquiry regarding the admonished shower comment: whether the resulting prejudice was incurable and therefore denies Simmons a fair trial. In both inquiries, our determination includes reviewing the amount of the evidence of the defendant's guilt. See *Tosh*, 278 Kan. at 85 (in addition to examining for ill will and whether conduct gross and flagrant, examine whether evidence against defendant is of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jurors); *cf. Gleason*, 277 Kan. at 642 (in addition to acknowledging trial court's sustaining objection and immediately admonishing jury, concluded evidence of guilt was direct and overwhelming; prejudice not incurable); *State v. Foster*, 259 Kan. 198, 212, 910 P.2d 848 (1996) (same). Accordingly, we will consider the two episodes of misconduct together.

In contending that the misconduct did not deny Simmons a fair trial, the State appears to argue the weight of the evidence by principally pointing out that Simmons was not convicted of all crimes. More specifically, he was acquitted on the aggravated kidnapping and aggravated criminal sodomy counts, and the jury failed to reach a verdict on one of the three rape counts. The State essentially suggests that the prosecutor's comments regarding the Stockholm Syndrome were only relevant to the aggravated kidnapping charge and, because Simmons was acquitted of that charge, the misconduct obviously cannot be reversible error. "Simmons cannot demonstrate that he was prejudiced by these comments concerning kidnap victims when he was acquitted of the [aggravated] kidnapping charge." On the surface, this argument appears

meritorious as an important element of aggravated kidnapping is "the taking or confining of a person, *accomplished by force, threat or deception*." (Emphasis added.) K.S.A. 21-3420 (kidnapping); K.S.A. 21-3421 (aggravated kidnapping).

Upon deeper examination, however, we must disagree with the State's surface argument. The prosecutor did not instruct the jury panel during voir dire to limit its consideration of the Stockholm Syndrome to any particular crimes, especially aggravated kidnapping. As mentioned, he instead told them they should generally use the syndrome as their lens when they examined certain evidence, "I ask that you view that evidence [that A.H. maybe identified at times with Simmons] in light of the Stockholm Syndrome." As a result, the prosecutor essentially argued that despite inferences that could be drawn by the jury panel from certain evidence, A.H.'s participation in the sex acts forming the basis for four of the charged crimes was not voluntary. As in the charged crime of aggravated kidnapping, the factor of voluntariness, *i.e.*, consent, also was an absolute defense to the sex crimes. The State needed to negate this defense for Simmons' convictions. See K.S.A. 21-3502(a)(1)(A) (rape is sexual intercourse with a person who does not consent . . . when the victim is overcome by force or fear); K.S.A. 21-3506(a)(3) (aggravated criminal sodomy is sodomy without consent . . . when victim overcome by force or fear).

Additionally, the jury was never told to disregard the prosecutor's discussion of the Stockholm Syndrome. Nor was it told to disregard his implication that the syndrome explained that A.H. psychologically identified with her captor and therefore could never truly give consent. We observe the jury then convicted Simmons of two counts of rape but was unable to reach a verdict on the third. Simmons, however, relies upon his acquittals of aggravated kidnapping and aggravated criminal sodomy to argue: "The jury must have thus believed that A.H. *willingly* spent *some* of the weekend with Mr. Simmons." (Emphasis added.) Given the mixed results of the verdicts, we will not speculate as to the exact effect the State's comments had on the jury during its deliberations on all charges. But we can conclude that the prosecutor's argument

that A.H. was not a voluntary participant because of the Stockholm Syndrome could easily have affected important parts of the trial.

The State makes a similar argument concerning the prosecutor's comment about A.H.'s thoughts during daily showers for the rest of her life. It contends the admonition worked "because the jury acquitted him of aggravated criminal sodomy, aggravated kidnapping and was unable to reach a verdict on a count of rape."

We must reject this argument for many of the same reasons we rejected the State's argument about the lack of prejudice caused by the Stockholm Syndrome discussion. While admittedly Simmons was not convicted of all charges, he was nevertheless convicted of two rape counts for acts committed during this entire episode. Furthermore, just as we concluded the prosecutor's argument that A.H. was not a voluntary participant because of the Stockholm Syndrome could easily have affected important parts of the trial, the prosecutor's appeal to sympathy for A.H. could have done so as well. Again, given the mixed results of the verdicts, we will not speculate as to the exact effect the showering comment had on the jury during its deliberations on all charges.

We pause to note our analysis of the shower comment technically is unfinished. Earlier we saw no valid reason for maintaining a separate, incomplete *Tosh* test for the specific prosecutorial misconduct scenarios described in *Pink, Lumbrera,* and *Campbell.* Similarly, we see no valid analytical reason for maintaining an incomplete *Tosh* test for when the effect of prosecutorial misconduct is allegedly cured by a timely jury admonition to disregard. See, *e.g., Jordan,* 250 Kan. at 195-96. Accordingly, the test stated and applied in *Jordan* and similar decisions is now clarified. As demonstrated above, we apply the *Tosh* test, with the extent of any ameliorating effect of a jury admonition obviously to be considered in step two when reviewing the amount of the evidence of guilt to determine whether the prosecutor's statements prejudiced the jury and denied defendant a fair trial. In this determination, however, we must also review the other factors comprising step two because no single factor is individually controlling. *Tosh,* 278 Kan. at 85. While ill will and gross and flagrant conduct are valid factors for

consideration, for analytical purposes we simply note that they do not appear in the shower comment.

Stating our ultimate conclusion another way, with these different verdicts demonstrating convictions, acquittals, or juror uncertainty on the six charges, we simply cannot conclude that the evidence against Simmons is of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jurors. See *McCaslin*, 291 Kan. at 715-16. Accordingly, we hold the prosecutor's discussion regarding the Stockholm Syndrome and comments about A.H.'s thoughts while showering combine to constitute reversible prosecutorial misconduct under both K.S.A. 60-261 (error not ground for new trial unless justice requires otherwise) and *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967) (conclusion beyond reasonable doubt that the error had little, if any, likelihood of having changed the results of the trial). See *State v. Warledo*, 286 Kan. 927, 948, 190 P.3d 937 (2008) (when analyzing the prejudicial nature of the prosecutor's improper comments, we are required to examine the comments in the context of the trial record as a whole). We reverse and remand for a new trial.

The remaining issues of alleged prosecutorial misconduct do not warrant reversal, but we will address them to supply guidance for remand. See *State v. Kunellis*, 276 Kan. 461, 476, 78 P.3d 776 (2003).

*Prosecutor's initial remarks during voir dire*

Simmons' next claim of prosecutorial misconduct occurred during a colloquy in the early stages of voir dire:

"[Prosecutor]: I, like the Judge said, this is about a girl named [A.H.] that was kidnapped and raped a couple of times.
"[Defense]: Objection, Your Honor. May we approach the bench?
"[Court]: Come forward."

After approaching, defense counsel explained he objected because rape was only an allegation:

"[Defense]: I object to the statement. He is telling them that this person has been raped. That is a decision for the jurors to make. That is an allegation only.
"[Court]: I agree. I agree. You need to preface this, 'the State's allegations are.'

"[Prosecutor]: All right.

"[Court]: You stated it as if it's a fact.

"So I will sustain the objection and instruct you to use the word 'allege' or something of that nature.

"[Prosecutor]: All right.

"[Court]: Thank you."

Back in the presence of the jury panel, the prosecutor resumed his voir dire with different language:

"[Prosecutor]: Like I said, the Judge told you what the nature of the charges are and *what the State is alleging*, that a rape occurred after a kidnap. Rape is not about sex. It's about control and it's about anger, and we are going to talk a lot about that. So this may shade your views of sex for the time being." (Emphasis added.)

Simmons argues that the prosecutor's initial comment prejudiced his right to a fair trial because it "asserted that the charged offenses were true and amounted to the personal opinion of the prosecutor of Mr. Simmons' guilt." He correctly points out that no jury admonition was given. The State essentially responds that the jury would realize the State believed Simmons was the perpetrator; otherwise, he would not be the one on trial.

The Court of Appeals panel determined it need not decide whether the prosecutor's comment was improper because it did not amount to plain error. More specifically, it held, because of the court's sustaining the objection, there was no reversible error unless defendant established the error was so prejudicial as to be incurable. *Simmons*, 2009 WL 981685, at *4 (citing *Gleason*, 277 Kan. at 642). It also found the comment did not indicate gross and flagrant conduct or ill will toward defendant.

The prosecutor's comment is analogous to one in *State v. McReynolds*, 288 Kan. 318, 202 P.3d 658 (2009). During voir dire, the prosecutor was explaining the difference between civil and criminal trials when he commented that an accused person, " '*whether they're guilty or not*, has a right to have a jury trial, *even guilty people.*' " 288 Kan. at 324. We acknowledged the appellant made a valid point that the statement, in isolation, undermined the presumption of innocence by suggesting he was guilty before the trial commenced. However, we noted that the prosecutor's entire

statement surrounding the excerpt "clearly placed the burden on the State to prove guilt and clearly articulated the presumption of innocence." 288 Kan. at 324. We further noted that in voir dire the prosecutor did not emphasize the defendant's guilt or ever attempt to shift onto him the burden of proof. Accordingly, we held the statement was not outside the bounds of permissible statements. 288 Kan. at 324-25.

Here, the prosecutor stated the victim had been kidnapped and raped. He did not suggest as strongly as in *McReynolds*, that the defendant was guilty of committing those crimes. Moreover, given our system of criminal justice, all potential jurors should recognize that the State believes the defendant committed the crime because it filed charges against the defendant and proceeded to trial. Additionally, after a proper objection and ruling, here the prosecutor immediately corrected his statement. Later during his voir dire, as in *McReynolds*, he again explained that the State bore the burden of proof on the rape and kidnapping charges. Under these circumstances, we hold that the prosecutor's statement concerning the rape and kidnapping without referring to them as "alleged" is not misconduct. Nevertheless, the statement should not be repeated on remand.

### Detective Austin's Testimony

Simmons' next claim of prosecutorial misconduct occurred during the prosecutor's direct examination of Detective John Austin. After exploring how he became involved in the case, the prosecutor asked Detective Austin what he did next. Detective Austin replied:

"[Detective Austin]: Mr. Simmons had finished his—was finishing his written statement. I talked with other officers, Officer Martin. Also, I called the County Attorney's office, spoke with them, determined probable cause—
"[Defense]: Objection.
"[Court]: Sustained.
"[Prosecutor]: Tell me—
"[Court]: Move along.
"[Prosecutor]: —what you did next. Actually, what you did next."

Simmons claims the prosecutor intentionally elicited testimony from Detective Austin for injecting his personal opinion that prob-

able cause existed to believe Simmons committed the crimes. The State responds that Detective Austin exceeded the scope of an otherwise valid question.

In agreeing with the State, the Court of Appeals panel determined that the prosecutor's question was not improper and noted that nothing in the record indicated that the prosecutor intentionally elicited this response from the detective. *Simmons*, 2009 WL 981685, at *5.

As noted by the court, our decision in *State v. Fewell*, 286 Kan. 370, 184 P.3d 903 (2008), is of guidance. There, a trooper testified that he became frustrated when a vehicle occupant denied that the smell of marijuana was present. The prosecutor asked the trooper to explain why he was frustrated, and the trooper concluded his response by saying, " 'People will lie about something just so simple.' " 286 Kan. at 386-87. The defendant claimed the trooper's comment was improper and the prosecutor's questioning constituted misconduct. Even though the defendant failed to preserve the issue for appeal by objecting, we noted that the prosecutor's questions of the trooper were appropriate because "the prosecutor did not ask a question that in any way attempted to elicit testimony from [the trooper] regarding [defendant's] credibility." 286 Kan. at 389.

Similar to *Fewell*, the prosecutor in this case asked a witness to explain a previous statement. The prosecutor's question—"[W]hat you did next[?]"—was innocuous and did not call for any objectionable response on its face. The prosecutor was attempting to have Detective Austin explain the chronological sequence of events in this case and Austin's involvement in them. It was not prosecutorial misconduct. Nevertheless, it should be avoided on remand.

*Prosecutor's comment on defense witness during closing argument*

Simmons' final claim of prosecutorial misconduct, like the showering comment, arose during the prosecutor's closing argument. When discussing the witnesses and testimony presented at trial, the prosecutor commented on defense witness Scott Debusk, Jr.'s testimony: "And the last witness, Scott Debusk, Junior, I would

submit to you, was just a last-ditch effort to smear—as a smear campaign of the victim." Simmons claims the prosecutor's comment about the purpose of Debusk's testimony was improper.

The State responds the comment was a reasonable inference based on Debusk's testimony and that the prosecutor was properly arguing why certain evidence should not be considered.

The Court of Appeals panel agreed with the State, determining that the prosecutor's comment was not objectionable because it was part of the broader context in which the prosecutor asked the jury to ignore the defense's attempt to "cast[] a poor light on the victim" and cloud the evidence. 2009 WL 981685, at *6.

From the record it appears Debusk's purpose in testifying was to inform the jury that A.H. befriended persons who manufactured methamphetamine. He testified he knew A.H. because he met her while she was living with his cousin, who later was imprisoned for manufacturing meth. After the State objected on relevance grounds, the court asked defense counsel to explain the relevance or it would sustain the objection. The defense counsel replied, "All right. Defendant has nothing further" and ended the examination.

We agree the prosecutor asked the jury to consider Debusk's brief testimony as part of a "smear campaign" of A.H. We have said that a prosecutor crosses the threshold of appropriate argument when the argument diverts the jury's attention from its duty to decide the case on the evidence and controlling law. *Martinez*, 290 Kan. at 1014-15. Here, however, he appeared to be asking the jury to reject Debusk's testimony and consider the case on the other evidence. While the prosecutor's comments therefore do not constitute misconduct, should Debusk similarly testify again on remand, the prosecutor should avoid such comments.

Reversed and remanded for new trial.

CARL B ANDERSON, JR., District Judge, assigned.