NOT DESIGNATED FOR PUBLICATION

No. 121,935

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

CHARLES L. FREEMAN III,
*Appellant*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; CHERYL A. RIOS, judge. Opinion filed December 3, 2021. Affirmed in part, reversed in part, and vacated in part.

*Jennifer C. Roth*, of Kansas Appellate Defender Office, for appellant.

*Michael J. Duenes*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before SCHROEDER, P.J., WARNER and ISHERWOOD, JJ.

PER CURIAM: Charles L. Freeman III timely appeals his convictions for aggravated criminal sodomy and aggravated indecent liberties with a child. Freeman argues the statutory elements involving the age of the victim in the two statutes under which he was convicted violate sections 1 and 5 of the Kansas Constitution Bill of Rights. He also contends the district court erred in changing three jury instructions—all related to charges of aggravated criminal sodomy—to reflect a different crime than what the State had originally charged, resulting in an unconstitutional constructive amendment of the State's complaint. Finally, Freeman argues prosecutorial error during voir dire and closing argument undermined his ability to obtain a fair trial.

1

In addressing Freeman's three complaints, we first find Freeman lacks standing to present his constitutional challenge to the statutes because the record reflects he was aware of the victims' ages at the time of the offenses. Next, we agree with Freeman the jury instruction errors require we reverse three of his convictions—counts 5, 7, and 8—for aggravated criminal sodomy. Finally, even if we presume the prosecutor's voir dire questions and statements in closing argument were erroneous, we find they were ultimately harmless given the strength of the State's evidence and the lack of any further indicators of prejudice in light of the record as a whole. Therefore, we are convinced beyond a reasonable doubt there was no reasonable possibility the prosecutor's actions affected Freeman's convictions. We affirm in part, reverse in part, and vacate in part.

FACTS

In June 2016, C.K. and B.F. both disclosed past instances of sexual abuse by their father, Freeman. The State initially charged Freeman with multiple sex crimes. After his preliminary hearing, Freeman pled not guilty to all charges. The State amended its complaint to reflect the dismissed charges; changed the dates of the incidents to reflect they occurred from January 1, 2007, through January 1, 2012; and charged Freeman with 1 count of aggravated indecent liberties with a child for lewd fondling of a child under 14 years of age and the offender 18 years or older, and 5 counts of aggravated criminal sodomy with a child under 14 years of age and the offender 18 years or older.

Freeman's jury trial started on December 4, 2017, where he chose to proceed pro se with standby counsel. At trial, the victims' stepfather testified he was horsing around with C.K. prior to taking a shower when C.K. gave him a hug, accidentally caught his robe, and his robe opened. C.K. pushed herself away from her stepfather, who tried to explain there was "nothing to be afraid of, it's just a body part." C.K. commented, "'Well if you knew what I knew, what happened to me, you'd understand.'"

2

*Mother's trial testimony*

The victims' mother (Mother) testified C.K. and B.F. had lived with Freeman in Topeka from June 2008 until July 2011. At the time of trial, the girls lived with Mother and her husband—the girls' stepfather—in Colorado Springs, Colorado. Mother corroborated her husband's testimony and explained she and her husband spoke with C.K. and B.F. to determine what had happened while the girls lived with Freeman. C.K. explained to her mother that Freeman had told her to touch him. B.F., however, told her mother that C.K. "'didn't get half of what I got. . . . Dad really did do much worse to me.'"

*C.K.'s trial testimony*

C.K. testified she was 18 years old at the time of the trial and currently lived with her mother and stepfather but previously lived with her father, Freeman. Freeman told C.K. that he had seen C.K. watching him use the restroom while the door was open. C.K. testified Freeman came into her bedroom and explained he wanted to show her what he was doing. Freeman forced C.K. to touch his penis.

*B.F.'s trial testimony*

B.F. testified she was 17 years old at the time of trial and was also currently living with her mother and stepfather. B.F. and C.K. had lived with Freeman in two different houses in Topeka for about four years. B.F. testified:

> "I guess [the sexual abuse] first got started because apparently I had been touching myself in my sleep and at school, and just in places that I cannot remember. And so I was to be punished for it. And this punishment was to, for some strange reason, to touch myself in front of [Freeman].

3

"And as it started to escalate, it went to the form of—the oral—the oral stuff. And then it escalated to much more, which it—it all kind of, like, blurs in and out of areas."

B.F. testified the sexual abuse occurred a few times per week, usually on the weekends, when everyone else in the house was asleep.

Freeman moved to a second house in Topeka with C.K. and B.F., where the sexual abuse escalated. B.F. stated, "I was forced to—he was, I guess, attempting to, at this time, at the second house, attempt to take my virginity." Another individual, John Smith, lived in the second house, and B.F. had to give Smith and Freeman oral sex. B.F. also testified she was forced to have anal sex with Smith but was never sexually abused by Smith when Freeman was not around. Freeman told B.F. if she did not perform the sexual acts, C.K. would have to.

*Debra Paton's trial testimony*

Debra Paton, a forensic services director, testified she was specially trained to speak with children about alleged physical and sexual abuse. Paton explained she was trained to interview children as young as 3 years old and as old as 18 years old. She would tailor her interviews based upon the child she interviewed. Paton completed over 1,000 forensic interviews and had experienced many interviews in which a child did not disclose abuse. Paton testified she was experienced in child abuse dynamics and delayed disclosure. Paton explained certain factors can affect a child's abuse disclosure and, while some children never disclose their abuse, some children may disclose abuse as much as 50 years later. Paton indicated children who have a relationship to a family member tend to have more difficulty disclosing abuse.

Paton performed a forensic interview with B.F. in August 2016. B.F. disclosed multiple acts of sexual abuse by Freeman, which was consistent with her trial testimony.

*Ryan Hayden's trial testimony*

Topeka police detective Ryan Hayden was provided a case report in August 2016 from the Colorado Springs Police Department regarding C.K.'s and B.F.'s sexual abuse claims against Freeman. Hayden testified an unknown registered sex offender had been living with Freeman during a portion of time the sexual abuse occurred. Hayden determined, through the course of his investigation, the unknown registered sex offender living with Freeman was Smith. Hayden contacted Smith in Coffeyville, and Smith confirmed his identity as the unknown sex offender and that he had been living with Freeman. Hayden's investigation and review of Paton's forensic interviews matched the victims' statements. B.F.'s estimated age during the time of abuse was between 9 and 12 years old and C.K. was between 10 and 13 years old.

*John Smith's trial testimony*

Smith testified he worked for Freeman and moved into Freeman's house with Freeman, Freeman's girlfriend, B.F. and C.K., and another coworker. Smith confirmed he was a registered sex offender and told Freeman a couple of months after he moved in.

When Smith first moved in, Freeman would tell Smith to leave the office and go work somewhere else on his computer while B.F. would come into the office for computer lessons. The office door was always closed during this time. B.F. would usually leave the office about an hour later and go to bed.

Freeman eventually asked Smith to come into the office while B.F. was in there and told B.F. to "'show [Smith] what you do for daddy.'" B.F. then performed oral sex on

Freeman. Freeman then told B.F. to "'do what you just did to daddy, to [Smith] now.'" About a week later, Freeman called B.F. into the office while Smith was working and told her she was old enough to learn about anal sex and had Smith perform anal sex with B.F. Smith testified he would not have sought a young girl to molest had Freeman not presented the opportunity to him.

*Freeman's trial testimony*

Freeman chose to testify at trial and requested his standby counsel take over his representation. Freeman testified C.K. and B.F. previously lived with their mother until 2008, when they were about nine years old. Freeman explained he was self-employed and allegedly owned a business worth $2.4 million. Freeman said he built his business for his children and claimed Mother instigated the girls' sexual abuse claims in an effort to take control of Freeman's business.

*Verdict and posttrial proceedings*

Prior to releasing the jury to deliberate, the State made an oral motion to amend its complaint a second time to reflect that the charged crimes occurred between July 2, 2008, through August 1, 2011. The district court accepted the State's second amended complaint for filing.

The jury convicted Freeman on all counts. Freeman wrote defense counsel a letter attempting to fire his counsel and get new counsel. Defense counsel filed a motion to withdraw, and the district court appointed new counsel.

Freeman's new counsel did not adopt Freeman's pro se filings, including identical motions to dismiss based on alleged speedy trial violations and a request to recuse the district judge. Freeman's counsel filed a motion for departure to an on-grid prison

6

sentence, suggesting: (1) Freeman had a relatively minor criminal history score of D; (2) his only felony convictions occurred over 30 years ago; (3) his criminal history had no prior sex offense; and (4) he was 67 years old, in poor health, and confined to the medical unit in the jail.

The district court denied Freeman's departure motion and sentenced him to imprisonment for life with a mandatory minimum term of 25 years for his primary conviction of aggravated indecent liberties with a child. The district court sentenced Freeman to a second, consecutive term of imprisonment for life with a mandatory minimum of 25 years on one count of aggravated criminal sodomy. Freeman's two life sentences were ordered to run concurrent to his other four sentences for aggravated criminal sodomy of imprisonment for life with a mandatory minimum term of 25 years.

ANALYSIS

I.    FREEMAN LACKS STANDING TO RAISE HIS CONSTITUTIONAL CHALLENGES.

Freeman argues K.S.A. 21-3506(a)(1), the aggravated criminal sodomy statute under which he was charged (now K.S.A. 2020 Supp. 21-5504[b][1]), and K.S.A. 21-3504(a)(3)(A), the aggravated indecent liberties with a child statute under which he was charged (now K.S.A. 2020 Supp. 21-5506[b][2][A]), are unconstitutional statutes on their face. Freeman asserts both statutes are essentially strict liability offenses that eliminate the mens rea aspect of the crime, which violates section 5 of the Kansas Constitution Bill of Rights because juries must find defendants commit crimes with a culpable mental state. Freeman also argues section 1 of the Kansas Constitution Bill of Rights guarantees the right to liberty, which includes not being imprisoned for a strict liability offense.

The State asserts the statutes for aggravated criminal sodomy and aggravated indecent liberties with a child are not strict liability offenses as Freeman alleges. The

7

State avers Freeman received the right to trial by jury as section 5 guarantees. The State further asserts Freeman's liberty right was not impeded by his imprisonment because of his intrusion upon the rights of others in committing the crimes.

*Preservation and standard of review*

Freeman raises this argument for the first time on appeal. Generally, a party cannot assert a new constitutional argument on appeal. However, there are three exceptions to the general rule:

> "'(1) The newly asserted claim involves only a question of law arising on proved or admitted facts and is determinative of the case; (2) consideration of the claim is necessary to serve the ends of justice or to prevent the denial of fundamental rights; or (3) the district court is right for the wrong reason.' [Citations omitted.]" *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015).

First, we must address the State and Freeman's failure to brief a procedural obstacle to Freeman's constitutional challenge: Does Freeman have standing to bring this claim? Our Supreme Court has characterized standing as jurisdictional. *State v. Stoll*, 312 Kan. 726, 734, 480 P.3d 158 (2021). We have an independent duty to consider whether subject matter jurisdiction exists over the issues on appeal. See *State v. Delacruz*, 307 Kan. 523, 529, 411 P.3d 1207 (2018). Because standing is a component of subject matter jurisdiction, it can be raised at any time, even on our own initiative. *Peterson v. Ferrell*, 302 Kan. 99, 102-03, 349 P.3d 1269 (2015). The existence of standing is a question of law subject to unlimited review; it requires "'a cognizable [legal] injury'" and a "'causal connection between the injury and the challenged conduct.'" *Stoll*, 312 Kan. at 734.

The discussion of standing provided by our Supreme Court in *Stoll* is instructive. Stoll was convicted of failing to register as an offender under the Kansas Offender Registration Act (KORA), K.S.A. 2020 Supp. 22-4901 et seq. On appeal, Stoll argued

KORA's penalty provisions violated her substantive due process rights because they lacked a mens rea requirement. The facts only established Stoll forgot to register, not that she lacked knowledge of the requirements. The *Stoll* court concluded those circumstances would not absolve Stoll of culpability if the statute required proof of mens rea. "Because she has not successfully argued that she lacked a culpable mental state, she fails to show that the strict liability nature of her offense had any effect on her." 312 Kan. at 734.

With respect to standing, the constitutional argument Freeman seeks to raise in this appeal is legally indistinguishable from Stoll's substantive due process argument. Freeman challenges the facial validity of the aggravated criminal sodomy statute and the aggravated indecent liberties with a child statute because the offenses impose strict liability regardless of his knowledge of the ages of the victims. Freeman, however, has not argued any applicable circumstances that would lead us to conclude the strict liability nature of the offenses had any effect on his convictions. The victims were Freeman's children whom he housed, fed, and took to elementary school. Freeman testified his daughters lived with their mother until they were about nine years old and, in 2008, the girls started living with him. Freeman also acknowledged his daughters' adolescence by testifying child protective services came to his house many times while the girls lived with him. In other words, Freeman has not shown any reasonable possibility of a different result at trial had the State been required to prove he knew C.K. and B.F. were under 14 years of age. The proven and admitted facts at trial establish Freeman knew the ages of his children. As in *Stoll*, Freeman lacks standing to raise a perceived legal injury that has no causal connection to his conviction. We dismiss Freeman's constitutional challenge for lack of standing.

II.     THE DISTRICT COURT ERRED IN INSTRUCTING THE JURY ON COUNTS 5, 7, AND 8.

Freeman argues the district court improperly instructed the jury on three uncharged crimes rather than the crimes charged by the State, creating an impermissible

9

constructive amendment constituting structural error. The State agrees the district court's jury instructions 14, 15, and 16 did not align with counts 5, 7, and 8—each for aggravated criminal sodomy—in the State's second amended complaint. The State also agrees the convictions for counts 5, 7, and 8 cannot stand and must be reversed and vacated. We agree. Jury instructions 14, 15, and 16 constituted an impermissible constructive amendment as the essential elements of criminal sodomy were changed from the allegations set forth in counts 5, 7, and 8 of the State's complaint. Accordingly, Freeman could not be tried and convicted on those charges as instructed. See *Stirone v. United States*, 361 U.S. 212, 217, 80 S. Ct. 270, 4 L. Ed. 2d 252 (1960); *United States v. Farr*, 536 F.3d 1174, 1180-81 (10th Cir. 2008); see also *State v. Johnson*, 310 Kan. 835, 839-40, 450 P.3d 790 (2019) (jury's verdict can only stand on the particular means of committing the crime for which it is instructed). We reverse Freeman's convictions for counts 5, 7, and 8 and vacate those sentences.

III.    FREEMAN FAILS TO SHOW PREJUDICIAL PROSECUTORIAL ERROR.

Freeman claims the State committed reversible error by asking the jury panel during voir dire about specific facts of the case. Freeman also argues the State, during closing argument, inappropriately told the jurors to ask themselves what C.K. and B.F. had to gain from testifying against Freeman. Freeman contends the State's comments prejudiced him and deprived him of a fair trial, which requires reversal of his convictions. Freeman admits he failed to object to the State's comments in voir dire and closing argument.

The State asserts the prosecutor was probing the jury panel for bias regarding the victims' delayed disclosure of sexual abuse. The State contends it was appropriately explaining to the jury panel what to look for in assessing witness credibility. The State also argues, even if we find error, it was harmless and did not prejudice Freeman.

With respect to prosecutorial error, a prosecutor's comments made during voir dire, opening statement, or closing argument are reviewed by appellate courts even if the defendant failed to contemporaneously object. *State v. Sean*, 306 Kan. 963, 974, 399 P.3d 168 (2017). Appellate courts use a two-step process—looking at error and prejudice—to evaluate claims of prosecutorial error.

> "To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial." *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

If the State establishes "'beyond a reasonable doubt'" the error complained of did not affect the outcome of the trial, then the prosecutorial error was harmless. 305 Kan. at 109.

*Voir Dire*

The State argues the prosecutor was attempting to determine if any potential jurors may show bias regarding a child who did not immediately report sexual abuse. That is, whether a delayed report would diminish the child's credibility about the allegations and whether a potential juror could be unbiased in evaluating the testimony of a child who did not report sexual abuse immediately after it occurred.

Voir dire is a mechanism used by the parties to select a competent panel of jurors who are "'without bias, prejudice, or partiality.'" *State v. Woods*, 301 Kan. 852, 870, 348 P.3d 583 (2015). Voir dire should be limited to inquiries about potential bias and not intentionally used as an opportunity for the State to argue its case. See *State v. Simmons*, 292 Kan. 406, 412, 254 P.3d 97 (2011). Freeman argues the State committed reversible error by asking the jury panel about specific facts in the case during voir dire.

11

The prosecutor's challenged comments must not be considered in isolation but "'in the context in which they were made.'" *State v. Davis*, 306 Kan. 400, 413, 394 P.3d 817 (2017). Generally, the district court exercises its sound discretion regarding the nature and scope of voir dire. Appellate courts have a duty to make an independent evaluation of the circumstances to determine whether the district court exercised sound discretion to ensure the jury would be impartial. *Woods*, 301 Kan. at 870.

Freeman does not cite any caselaw directly on point with his argument. He relies on *State v. Zamora*, 247 Kan. 684, 692-93, 803 P.2d 568 (1990), where our Supreme Court limited its holding to the specific facts of the case and determined the district court did not abuse its discretion by not allowing defense counsel to continue its voir dire questions about evidence of "unusual sexual practices."

In *Simmons*, our Supreme Court held the State committed reversible error when it questioned the jury panel about Stockholm Syndrome. While the court acknowledged prosecutors may inquire on possible bias during voir dire, it found the State went too far when it asked the voir dire panel to view evidence with the understanding that the victim may have identified with the defendant due to Stockholm Syndrome. The court determined the statement was an "improper argument of an important part of [the State's] case" and the State used voir dire to improperly refer to facts not admitted into evidence. 292 Kan. at 412-13. Our Supreme Court additionally found the State erred because the prosecutor's comments essentially implied he was an authority on Stockholm Syndrome. 292 Kan. at 414.

Here, the prosecutor had the following discussion with the voir dire panel:

"[PROSECUTOR]:  Has anybody . . . had an experience where they've talked to somebody as an adult, they've told you about an incident of sexual misconduct against

12

them, a molestation, that occurred to them as a child and they're now saying it for the first time as an adult? Has anybody experienced that? Know anyone?

. . . .

"[PROSECUTOR]:  Would you agree that there are a lot of factors that play into maybe why someone doesn't disclose right away?

"[PROSPECTIVE JUROR (THREE)]: Sure.

"[PROSECUTOR]:  Could it be because it's kind of an intimate thing, right? I mean, it's doing something—I don't know exactly what your circumstances were, but I think a lot of you have children in here. And who in here talks to their children about good touch/bad touch? A lot of you, okay. And what's—what's the context or what do we think of bad touch, right, we don't want to tell people about bad touch, it's because they're bad. And they are usually in parts of the body that are intimate, right, it's our private parts.

"So can you imagine—is there anyone here—hold on ma'am. Is there anyone in here that can't imagine—well, can imagine if I asked you to come in and tell me about the last time that you had sexual intercourse with your significant other? Would you feel comfortable doing that? Anyone?

"[UNIDENTIFIED PROSPECTIVE JUROR]:  (Raising hand.) I wouldn't care.

"[PROSECUTOR]:  You must be a rock star.

"He's an anomaly. Most of us are a little more humble than that, or not quite the rock star. But, yeah, so one out of 60. Yeah, so is there anyone here that can imagine a child wanting to talk about something like that that happened to them? You can understand that, right? Is there anyone that can't understand that?"

. . . .

"[PROSECUTOR]:  Is there anyone in here that if a child doesn't disclose right away, then you find them to be uncredible? No?"

When considering whether the prosecutor's statements constitute error we must determine whether the statements fell outside the wide latitude afforded prosecutors to conduct the State's case and not offend Freeman's constitutional right to a fair trial. The prosecutor's voir dire questions asking the jury to "imagine" or "understand" delayed disclosure of sexual abuse risk being erroneous for the prosecutor potentially acting as an unsworn witness or authority about delayed disclosure. See *Simmons*, 292 Kan. at 414;

13

see also *State v. Miera*, No. 117,554, 2019 WL 640013, at *5 (Kan. App. 2019) (unpublished opinion) (prosecutor's voir dire questions beginning with phrase "'Does everyone understand'" risk being erroneous).

Here the prosecutor went too far and committed error, but Freeman's claim fails under the prejudice prong as the prosecutor's questions did not affect the outcome of the trial and was harmless. See *Sherman*, 305 Kan. at 109-10. The prosecutor presented expert testimony at trial explaining why some children delay disclosure of sexual abuse, if they choose to disclose at all. Freeman did not contest the prosecutor's voir dire questions and did not contest Paton's expert testimony at trial, other than asserting she was testifying outside of her report.

The prosecutor questioned the potential jurors to determine whether they showed bias toward Freeman or the victims, given the victims' delay in disclosing the sexual abuse for years. Moreover, there was substantial corroborating trial testimony from both victims, their mother and stepfather, and Smith—the other perpetrator—about the sexual abuse. The corroborating evidence was in line with Paton's expert testimony regarding certain factors that can affect a child's abuse disclosure, including the fact children who have a relationship with a family member tend to have a more difficult time disclosing abuse.

The prosecutor explained during voir dire and closing argument it was the State's burden to prove Freeman's guilt beyond a reasonable doubt. The jury instructions also specifically stated:

- "Statements, arguments, and remarks of counsel are intended to help you in understanding the evidence and in applying the law, but they are not evidence. If any statements are made that are not supported by evidence, they should be disregarded."

14

- "The State has the burden to prove the defendant is guilty. The defendant is not required to prove that he is not guilty. You must presume that he is not guilty unless you are convinced from the evidence that he is guilty.

  . . . If you have a reasonable doubt as to the truth of any of the claims required to be proved by the State, you must find the defendant not guilty."
- "It is for you to determine the weight and credit to be given the testimony of each witness. You have a right to use common knowledge and experience in regard to the matter about which a witness has testified."

Jurors are presumed to follow the instructions given by the court. *State v. Dinkel*, 314 Kan. 146, 154, 495 P.3d 402 (2021). The State's discussion of delayed disclosure during voir dire was error; however, any error was harmless beyond a reasonable doubt given the strength of the evidence against Freeman, the overall context in which the statements were made, the evidentiary support at trial in line with the prosecutor's comments, and the district court's instructions to the jury.

*Closing Argument*

Freeman next asserts the State vouched for C.K.'s and B.F.'s credibility and shifted the burden of proof to Freeman during closing argument. The State responds:

- The prosecutor simply asked the jury to consider what motivation C.K. and B.F. had to be untruthful and did not comment on the victims' truthfulness;
- The prosecutor's questions posed to the jury were particularly legitimate because Freeman attacked C.K.'s and B.F.'s credibility; and
- Freeman waived his argument about burden-shifting because he failed to explain how the burden was shifted and because the State never mentioned the burden.

"Prosecutors enjoy wide latitude in crafting closing arguments. This latitude allows a prosecutor to argue reasonable inferences that may be drawn from the admitted evidence . . . . [Citations omitted.]" *State v. Pribble*, 304 Kan. 824, 832, 375 P.3d 966 (2016). Within the wide latitude provided to the prosecutor, he or she can explain to the jury relevant factors that may be considered to assess witness credibility and may argue why the factors ought to lead to a compelling inference of truthfulness. 304 Kan. at 835. Our Supreme Court has explained a prosecutor may also fairly comment on the believability of and the evidence underlying the defense theory. See *State v. Butler*, 307 Kan. 831, 868, 416 P.3d 116 (2018). In fact, our Supreme Court has held a prosecutor's argument that a victim lacked motive to be untruthful did not constitute vouching for the witness' credibility, stating:

> "It was not improper for the prosecutor to argue that [the victim] did not have a motive to be untruthful—this statement does not constitute vouching for the witness' credibility. This conclusion is strengthened by the fact that defense counsel also made comments during closing argument as to whether [the victim] or King had a greater motivation to fabricate a story." *State v. King*, 288 Kan. 333, 353, 204 P.3d 585 (2009).

Prosecutors are not, however, permitted to offer personal opinions about the credibility of witnesses that would constitute "'unsworn, unchecked testimony'" or to attempt to shift the burden of proof to the defendant. *Pribble*, 304 Kan. at 835, 837.

Freeman alleges the prosecutor erred in making the following comments in closing arguments:

> "When you look at the evidence, when you determine whether or not a witness is believable, when you weigh their credibility, you can ask yourself why are they saying what they're saying? Why now? Why not—why limit it to what they are saying? Why would [B.F.] and [C.K.] say what they were saying? What would they have to gain from that? Why would they subject themselves to coming here and testifying in front [of] 12

16

strangers about things, very intimate things, obviously you saw [C.K.] testify, very painful things. And why limit them to what they testified to? Why would [C.K.] only say that this defendant touched her one time, or that he had her touch him one time? Why would she limit it to just that one time? Why would [B.F.] not say that this defendant had anally raped her? Why would she say that it was just John Smith that had raped her at the defendant's request? Those are things you can think about as you're weighing the credibility of a witness. What they had to gain. What they had to lose. Why they are saying what they're saying."

This argument by the prosecutor draws extremely close to the line of permissible comments regarding a witness' lack of motive to be untruthful. However, the prosecutor's comments about the believability of C.K. and B.F. were made in closing after Freeman attacked their credibility, alleging they were coached into lying so their mother could obtain control of Freeman's business.

By asking the jury to consider whether the victims had some motive in testifying, the prosecutor did not vouch for their credibility. See *King*, 288 Kan. at 353. The prosecutor did not tell the jury his personal opinions about C.K.'s and B.F.'s credibility. However, given the strength of the evidence against Freeman and the lack of any other indicators of prejudice, even if the combination of statements was error, Freeman has failed to show prejudice as any error was harmless beyond a reasonable doubt and did not violate Freeman's constitutional right to a fair trial.

Freeman also asserts in a conclusory argument the State improperly shifted the burden of proof to him. Freeman waives such argument as it is incidentally raised and not argued. See *State v. Lowery*, 308 Kan. 1183, 1231, 427 P.3d 865 (2018). But we will briefly address Freeman's conclusory argument, even though we find it unpersuasive.

17

The State explained to the jury during closing argument it had the burden to prove each of its claims beyond a reasonable doubt. In the beginning of the State's argument, the prosecutor stated:

"In these [jury] instructions are the list of crimes that this defendant has now been charged with. In each crime, there are elements or claims, as the Judge described them. As we talked about in voir dire, and as I'm telling you now, the State only has to prove those claims. Nothing more; nothing less. The State does have to prove them beyond a reasonable doubt. The defendant doesn't have to prove anything."

After discussing the evidence admitted at trial for each claim, the State again explained to the jury:

"Those are the six crimes I'm asking you to find this defendant guilty of. And as you go back through the evidence, I'm going to ask you to look at that very specifically. And I'm going to ask you to look at the evidence and how it proves beyond a reasonable doubt that the defendant is guilty of those crimes."

The prosecutor continued to explain to the jury on numerous occasions the evidence at trial proved the charges against Freeman beyond a reasonable doubt. We observe no argument where the prosecutor attempted to shift the burden of proof to Freeman during closing argument.

CONCLUSION

We dismiss Freeman's constitutional challenge as his perceived injury has no causal connection to the injury he claims. Freeman's conviction and sentence for aggravated indecent liberties with a child and his convictions and sentences for two of the five aggravated criminal sodomy convictions are affirmed. The remaining three convictions for aggravated criminal sodomy reflected in counts 5, 7, and 8 in the State's

18

second amended complaint are reversed and vacated. But vacating the sentences for those three convictions will not impact Freeman's controlling sentence as they were ordered to be served concurrently with his two consecutive sentences of imprisonment for life with a mandatory minimum term of 25 years. The district court should prepare a nunc pro tunc journal entry to reflect the three aggravated criminal sodomy convictions have been reversed and the corresponding sentences vacated. Finally, we note Freeman has failed to show any of the presumed, but not decided, errors by the prosecutor resulted in prejudicial error.

Affirmed in part, reversed in part, and vacated in part.

19